JUSTICE HUNT
delivered the Opinion of the Court.
¶1 Following a trial by jury, Defendant Stacy J. Schipman (Schipman) was convicted of negligent homicide, a felony, pursuant to § 45-5-104, MCA (1995), and negligent endangerment, a misdemeanor, pursuant to § 45-5-208, MCA (1995). Schipman appeals from the Findings, Reasons, Judgment & Order Deferring Imposition of Sentence issued by the Fifth Judicial District Court, Beaverhead County. We reverse and vacate Schipman’s conviction of negligent homicide.
¶2 The dispositive issue on appeal is whether the result of Schipman’s conduct in leaving the scene after striking the horse was negligent homicide.
Factual and Procedural Background
¶3 At about 9:45 p.m. on July 21,1995, Schipman left his two daughters with a babysitter at his trailer home near Dillon, Montana, and headed to a birthday party at the Glen Bar. Schipman first went to the Metlen Bar, arriving at approximately 10 p.m., where he consumed one beer. He then proceeded to the Glen Bar, arriving at about 10:45 p.m., only to find that the birthday party was over. Schipman nevertheless remained at the bar and played pool until about 12:30 p.m. While at the Glen Bar, Schipman stated that he thought he consumed about three more beers.
¶4 In the early morning hours of July 22, 1995, Andy Weakley (Weakley) was driving on Montana Highway 91 north of Dillon when he noticed that a horse was loose on the highway. Although it was a dark and rainy evening and the horse was a dark color, Weakley was able to spot the horse running on the highway and stopped his vehicle. Weakley then attempted to catch the horse, but was unable to restrain the animal. Unable to capture the horse, Weakley immediately returned to Dillon and called 911 at 1:41 a.m. to report the horse running on the highway.
*275 ¶5 It was a very dark night, according to Schipman, when he left the Glen Bar. Schipman was nearly home from the bar when a dark horse lunged out of the ditch alongside the highway and struck his vehicle, causing extensive damage to the passenger side of Schipman’s truck. The horse lunged so suddenly that Schipman had no time to react and, thus, did not attempt to swerve or brake to avoid hitting the horse. Schipman recounted that only the front torso of the horse was on the highway upon impact. After hitting the horse, however, Schipman did not stop his vehicle; looking back Schipman did not see the horse on the highway and, assuming that it was dead, proceeded home. Upon arriving home, Schipman’s neighbor asked him what had happened to his truck. Schipman described the collision to his neighbor, stating that he had hit the horse so hard that the impact had knocked the horse into the borrow pit alongside the highway, and that he was sure the horse was not still on the highway.
¶6 Meanwhile, Weakley returned to the location where he had first seen the dark horse. He discovered the horse in approximately the same location as before, but the horse was lying motionless across the southbound lane of the highway. Upon inspecting, Weakley determined that the horse appeared to have a broken neck. Weakley thought the horse was dead. Thus, he parked his vehicle in the northbound lane of Montana Highway 91 some distance ahead of the horse, and turned on his flashers in an attempt to warn oncoming traffic of the road hazard. Shortly thereafter, a second vehicle driven by Larry Mallon (Mallon) pulled in behind Weakley’s vehicle.
¶7 At about this same time, two recent high school graduates, Jamie Keller (Keller) and Tresa Dorvall (Dorvall), were returning home to Dillon after spending an evening with friends in Virginia City. Keller was driving Dorvall’s older model Toyota pickup at a speed of about 55 miles per hour. Upon noticing two vehicles parked in the northbound lane of travel, Keller slowed down. However, Keller could not see any reason why the two vehicles were stopped. Dorvall, upon seeing two men standing by the side of the road, told Keller not to stop. Thus, Keller continued past the two men until Dorvall exclaimed, “There’s something in the road.” Keller then saw the horse but it was too late. She pulled the vehicle to the right because she thought that it would be better to go into the borrow pit than to hit the horse. Keller could not avoid hitting the horse.
¶8 Upon impact, Keller initially lost consciousness. When she came to, she was still inside the vehicle and the vehicle was in the borrow pit. *276 However, Dorvall was not in the vehicle. Dorvall had been thrown from the pickup and was lying off the road not far from the horse. Dorvall was having great difficulty breathing, and subsequently died from the injuries she sustained. Beaverhead County authorities responded to the accident, and the first officer on the scene reported that even with knowledge of the horse’s location, it was very difficult to spot the dead horse on the highway.
¶9 Upon arriving home after the accident, Schipman called his girlfriend and told her that he had hit a horse but that he thought it went into the ditch alongside the highway. According to Schipman, he did not immediately report hitting the horse to the authorities because he
had been drinking. It was not enough in my opinion to — I did not consider myself intoxicated, but I considered myself a likely candidate for a Breathalyzer that would maybe flunk. Drink two beers and you are legally intoxicated on the Breathalyzer. I did not want to risk my — I did not want to risk that.
¶ 10 The day following the accident, Schipman called authorities to report hitting the horse. When interviewed about the accident, Schipman told authorities that he did not call in the accident immediately after hitting the horse because he had been drinking and did not want to risk being charged with a DUI. When asked why he did not stay at the accident scene, Schipman responded, “No reason I guess.”
Discussion
¶11 The dispositive issue on appeal is whether the result of Schipman’s conduct in leaving the scene after striking the horse was negligent homicide.
¶ 12 The parties agree on appeal that Schipman’s conduct in leaving the scene of the accident without first stopping to determine whether the horse was blocking the roadway and whether there was a need to warn oncoming motorists of that road hazard is the alleged criminally negligent act underlying Schipman’s convictions. Thus, the dispositive question becomes whether Schipman’s decision to leave the scene of the accident was the cause in fact of Dorvall’s death.
¶ 13 Schipman was convicted of negligent homicide, a felony, pursuant to § 45-5-104, MCA (1995), which provides that “[a] person commits the offense of negligent homicide if he [or she] negligently causes the death of another human being.” Section 45-5-104(1), MCA (1995). Schipman was also convicted of negligent endangerment, a misdemeanor, pursuant to § 45-5-208, MCA (1995), under which “[a] person *277 who negligently engages in conduct that creates a substantial risk of death or serious bodily injury to another commits the offense ofnegligent endangerment.” Section 45-5-208(1), MCA (1995). Therefore, as a material element of either offense, the State was required to prove beyond a reasonable doubt that Schipman’s conduct was criminally negligent pursuant to the definition of § 45-2-101(42), MCA (1995). ¶ 14 The conduct alleged to be negligent was Schipman’s decision to leave the scene of the collision without taking action to warn other motorists of the potential risk the horse posed. Schipman’s collision with the horse occurred in an “open range” area on a stormy night. Numerous witnesses testified that the horse was dark in color, and that it was virtually impossible to perceive the horse on the road given that it was a dark and rainy night. Following the impact with the horse, as Schipman points out, he looked back to see if the horse was on the highway but he could not see it lying in the roadway. On several occasions following the collision, Schipman stated that he firmly bélieved that the horse was in the borrow pit alongside the highway. The serious body damage to the passenger-side of Schipman’s truck supports Schipman’s story. Following the accident, since Schipman’s truck was leaking radiator fluid and Schipman had glass shards in his head, Schipman chose to drive one fourth of a mile to the driveway of his trailer court to attend to his personal problems. In sum, Schipman left the scene of the collision with the horse under a mistaken belief that the horse was dead and in the ditch alongside the highway.
¶ 15 Schipman contends that had he remained at the scene of the accident, the actual result would not have been any different. In so arguing, Schipman contends that there were “independent intervening events,” namely, the young girls’ decision to disregard the warnings of Weakley and Mallon, which should absolve him of criminal liability for the result of Dorvall’s death. After Schipman departed from the scene of the accident, Weakley and then Mallon stopped near the dead horse and Weakley engaged the hazard lights of his vehicle. As Keller and Dorvall subsequently approached the scene of the accident, Weakley got out of his vehicle, and began waiving his arms and yelling, “Stop.” When Keller did not appear to be slowing down, Weakley then flashed his headlights on and off. Keller recounted seeing the hazard lights and the two men on the roadside in the middle of the night. Upon seeing the two men, Keller and Dorvall made a conscious decision not to stop. Based on these facts, Schipman argues that the *278 jury should not be allowed to speculate as to whether Keller would have slowed down or stopped had there been three vehicles with their flashers on and three men along the roadside attempting to warn oncoming traffic of the horse in the road. Therefore, Schipman asserts that this Court should not permit the result, i.e., the death of Dorvall, to influence his criminal culpability. We agree.
¶ 16 In this case, cause in fact was not established. Even though Schipman did not stop at the scene of the accident, others did. Those who did made every reasonable effort to warn oncoming motorists that a hazard existed on the road. They parked their vehicles on the highway, left their headlights on, activated their emergency blinkers, and tried to warn oncoming motorists. Had Schipman stopped, he could not have done more. In spite of the efforts to warn motorists of the road hazard, the vehicle in which Dorvall was a passenger did not stop. The girls did not do so because they noticed two men alongside the road. There is no basis to speculate that they would have stopped or avoided the road hazard had they seen three men alongside the road.
¶ 17 Schipman claims in his reply brief on appeal that “[i]f this Court finds that his actions do not amount to criminal negligence, both the misdemeanor [negligent endangerment] and felony [negligent homicide] convictions must fall.” We disagree. First, we note that Schipman’s contentions in his principal brief on appeal appear to focus exclusively on the infirmity of his negligent homicide conviction; only in his reply brief does Schipman claim that the issues raised on appeal relate to both convictions. Second, in this decision, we have assumed, without deciding, that Schipman’s actions were criminally negligent under the definition of § 45-2-101(42), MCA(1995).
¶ 18 We conclude that there is no evidence that Schipman’s negligent act did, in fact, cause Dorvall’s death. Therefore, the elements of negligent homicide have not been proven and Schipman’s conviction for that offense must be reversed.
¶ 19 The conviction for negligent homicide is reversed and vacated.
JUSTICES NELSON, TRIEWEILER and REGNIER concur.