No. 99-315

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 9

WENDY MICHAEL PULA,

Plaintiff and Appellant,

v.

STATE OF MONTANA,

Defendant and Respondent.

APPEAL FROM: District Court of the Seventeenth Judicial District,

In and for the County of Blaine,

Honorable John C. McKeon, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Robert M. Peterson, Peterson Law Office, Havre, Montana

Daniel A. Boucher, Altman & Boucher, Havre, Montana

For Respondent:

Dana L. Christensen, Christensen, Moore, Cockrell, Cummings

& Axelberg, P.C., Kalispell, Montana

Submitted on Briefs: February 27, 2001

Decided: January 25, 2002

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Wendy M. Pula (Pula) appeals the verdict and judgment in favor of the State of Montana (State), in the Seventeenth Judicial District Court, Blaine County. Pula contends that the District Court erred when it denied her motion in limine to exclude evidence of third party misconduct, that there is insufficient evidence to support the jury's verdict and that the District Court improperly instructed the jury on intervening and superseding cause. We affirm the verdict and judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 This matter arises out of a suit filed in United States District Court by Pula against the State of Montana, the City of Chinook, three Chinook police officers, Blaine County, and the Sheriff of Blaine County. All claims against the City of Chinook, Blaine County, and their officers and employees were dismissed following settlement with Pula. The United States District Court dismissed the pendant claim for negligence against the State of Montana, allowing Pula to refile in state court. Pula then sued the State in Blaine County, alleging negligence in the incarceration, monitoring and control of Montana State Prison inmate Chester Bauer. Bauer has a history of sexual assaults against women and had been serving sentences at the Montana State Prison for sexual intercourse without consent, aggravated assault and felony intimidation. However, after being assaulted by fellow inmates and testifying against them, the State arranged to have Bauer housed in the Blaine County Jail for his own protection.

¶3 The record indicates that Bauer came to be on quite friendly terms with his jailers in Blaine County. He was allowed to roam the facility at will, had access to keys and was permitted to work in and outside the jail wearing civilian clothes. He also ran errands for the jail staff.

¶4 Pula, a twenty-year-old female, had been ticketed for minor in possession of alcohol.

After failing to appear in court for the ticket, she was picked up by police and taken to the Blaine County Jail. For whatever reason, either because she had no money or was afraid or unwilling to call a friend or relative for assistance, Pula could not post bond and was jailed pending an appearance before a judge. Because all cells in the women's block were full, officers put Pula in one of the jail's solitary confinement cells.

¶5 The next day, Bauer came to visit Pula in her cell. He introduced himself, asked if she was okay, and asked her if there was anything he could do to help her. Pula later testified at trial that, since Bauer was dressed in civilian clothes and seemed to have free run of the place, she believed that he worked at the jail. She also remembered seeing him around the grocery store where she worked.

¶6 During the course of the day, May 26, 1995, Bauer and Pula exchanged a series of notes. Later that night, at approximately 3:00 a.m., Bauer came back to Pula's cell. Using the jail keys, he unlocked her cell and invited her to his, ostensibly to watch TV. Pula went willingly. While in his cell, however, Bauer began to fondle Pula. When she protested he told her that he had stolen the keys and, if anyone found out she was out of her cell, she would go to prison for ten years for escape. Bauer then raped her. Afterwards, he returned Pula to her cell and locked her in. Pula said nothing about the incident to jail officials but reported the rape to friends the next day.

¶7 In the ensuing criminal trial, Bauer was convicted of sexual intercourse without consent, intimidation and misdemeanor escape. Pula also filed a civil complaint in the United States District Court alleging negligence and violation of 42 U.S.C. § 1983 against the City of Chinook, three Chinook police officers, Blaine County, the Sheriff of Blaine County, and the State of Montana. All claims against parties other than the State were dismissed following settlement with those parties. The United States District Court dismissed the § 1983 claim against the State and then ruled that it was without jurisdiction to hear the pendent negligence claim. Pula then refiled her negligence claim against the State in the Seventeenth Judicial District Court, Blaine County.

¶8 In her complaint, Pula alleged that the State breached its duty of care in the incarceration, supervision and control of Bauer and that this breach resulted in Bauer's attack and Pula's resulting psychological and economic damages. The State denied negligence and argued that any damages sustained by Pula were the result of independent and unforeseeable intervening acts: in particular, the negligence of the other defendants named in the original federal suit, the contributory negligence of Pula herself and Bauer's

intentional act.

¶9 At trial Pula sought to prevent the State from presenting evidence concerning the negligence, fault, or conduct of non-parties to her complaint, including but not limited to Blaine County, the City of Chinook, Blaine County officials and Bauer, himself. She contended that such evidence represented an impermissible attempt to apportion liability to non-parties. The State argued that such evidence was admissible as proof of an intervening cause of Pula's injuries. The District Court denied Pula's motion in limine, allowing such evidence for the purpose of demonstrating an intervening or superseding cause for Pula's claimed injuries but not for the purpose of attempting to allocate liability to non-parties.

¶10 At the close of trial, the District Court submitted its own proposed jury instructions. These included instructions on the meaning of intervening and superseding cause, to which Pula objected. In addition, the District Court submitted a special verdict form which required the jury to first decide if the State was negligent and, if so, whether that negligence was a cause of any injury or damage to Pula. If the jury answered no to the causation question, it was instructed to go no further. If it answered yes, it was to determine whether there was an intervening or superseding cause. The jury determined that the State was negligent but that its negligence was not a cause of Pula's injuries.

¶11 Pula raises the following issues on appeal:

¶12 Issue 1. Did the District Court err when it denied Pula's motion in limine to exclude evidence of intervening and superseding causes of Pula's injuries?

¶13 Issue 2. Was there sufficient evidence to submit the case to the jury?

¶14 Issue 3. Did the District Court's jury instructions and verdict form incorrectly instruct the jury on the law of intervening and superseding cause?

## DISCUSSION

*Issue 1. Did the District Court err when it denied Pula's motion in limine to exclude evidence of intervening and superseding causes of Pula's injuries?*

¶15 We review a District Court's grant or denial of a motion in limine for an abuse of discretion. *Bramble v. State Dept. of Justice, Motor Vehicle Div*., 1999 MT 132, ¶ 16, 294

Mont. 501, ¶ 16, 982 P.2d 464, ¶ 16; *Dill v. Montana Thirteenth Judicial Dist. Ct.*, 1999 MT 85, ¶ 8, 294 Mont. 134, ¶ 8, 979 P.2d 188, ¶ 8. The District Court has broad discretion to determine if evidence is admissible. Accordingly, absent an abuse of discretion, we will not overturn the District Court's determination. *Busta v. Columbus Hospital Corp.* (1996), 276 Mont. 342, 353, 916 P.2d 122, 130.

¶16 Pula contended at trial and argues now on appeal that introduction of evidence concerning the actions of Blaine County permitted the State to apportion blame or responsibility to non-party defendants. She cites our decision in *Plumb v. Fourth Judicial Dist. Ct.* (1996), 279 Mont. 363, 379, 927 P.2d 1011, 1021, for the proposition that such third party defenses violate substantive due process because juries are likely to assign a dispro-portionate share of liability to unrepresented parties-thereby reducing the recovery from the named defendant. While we concur with her statement of our holding in *Plumb,* we find it inapplicable to Pula's case.

¶17 In *Plumb*, we concluded that portions of the 1995 amendments to § 27-1-703, MCA, which allowed apportionment of liability to parties who are not named in the lawsuit, violated substantive due process. *Plumb*, 279 Mont. at 379, 927 P.2d at 1021. The issue in this case, however, is not how to apportion blame among several liable parties but whether, because of the intervening negligence of another, the State's acts or omissions could be said to be the cause of Pula's injuries. Our decision in *Plumb* did not disturb the validity of the intervening cause exception to the general test for causation, and we have repeatedly upheld its validity-even after our decision in *Plumb*. See *State v. Schipman*, 2000 MT 102, 299 Mont. 273, 2 P.3d 223; *Gentry v. Douglas Hereford Ranch, Inc.*, 1998 MT 182, 290 Mont. 126, 962 P.2d 1205. Evidence of the conduct of Blaine County and Bauer was relevant to the issue of causation in Pula's negligence claim and was properly admitted by the District Court.

*Issue 2. Was there sufficient evidence to submit the case to the jury?*

¶18 Prior to submission of the case to the jury, the District Court denied Pula's motion for judgment as a matter of law. Motions for judgment as a matter of law are governed by Rule 50(a), M.R.Civ.P., which provides:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion

for judgment as a matter of law against the party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

¶19 Considering all evidence in the light most favorable to the opposing party, judgment as a matter of law is properly granted only when there is a complete absence of any evidence which would justify submitting an issue to the jury. *Armstrong v. Gondeiro*, 2000 MT 326, ¶ 26, 303 Mont. 37, ¶ 26, 15 P.3d 386, ¶ 26.

¶20 Pula argues that, absent what she considers to be improperly admitted intervening cause evidence, the State presented no evidence to counter her claims of duty, breach, causation and damages. Our review of the trial record does not support this contention.

¶21 The State presented substantial evidence that the damages suffered by Pula were not the result of its negligent acts or omissions. Its case included testimony and documentary evidence that it did not breach any relevant standard of care, that its acts or omissions were not the actual or proximate cause of Pula's injuries and that many of the economic damages for which Pula sought recovery may have been related to events that occurred prior to the rape. The State presented evidence that it transferred Bauer to Blaine County for legitimate penological reasons and did so knowing that the county jail was a secure modern facility. It offered testimony that it provided Blaine County officials with timely and appropriate guidelines for Bauer's incarceration.

¶22 There was evidence that, despite the State's guidelines, Sheriff Harrington, shortly after Bauer's transfer to Blaine County, unilaterally decided to treat Bauer as a "trustee." Without any authorization from the State, Harrington allowed Bauer to work outside the jail and to wear civilian clothing. On September 9, 1994, approximately three months after Bauer was transferred, Blaine County Jailer Jim Doyle faxed a letter to Warden Mahoney requesting permission for Bauer to work outside the jail. Bauer's prison supervisor, Bill Pohjola, called Doyle and left a message which Doyle acknowledges having received. The message advised Doyle that Bill Pohjola from the prison had called stating that the prison would not "OK" Bauer to work outside the jail at that time.

¶23 Approximately six months later, in March of 1995, Ed Schmidt, Havre Probation and Parole Officer, learned that Bauer was being treated as a "trustee." Schmidt was concerned about this state of affairs and contacted his supervisor who, in turn, contacted officials at MSP. As a result, Schmidt was asked to conduct a more thorough review, which he did.

He subsequently filed a report with Classification Manager Candyce Neubauer and spoke with her on the telephone. Neubauer, Pohjola and Mahoney determined that Bauer could stay in Blaine County if they were assured that Blaine County would appropriately and safely incarcerate Bauer.

¶24 Neubauer contacted Jailer Doyle and relayed her concerns about Bauer's status. Doyle assured her that Blaine County would appropriately and safely incarcerate Bauer. Schmidt personally met with Sheriff Harrington, Jailer Doyle and Undersheriff Murdock and was assured that Bauer would be properly housed.

¶25 On April 4, 1995, Neubauer sent two letters to Blaine County, one to the Sheriff and one to Jailer Doyle setting forth the State's concerns regarding Bauer's incarceration. In particular, the letter reiterated that MSP officials had become "very concerned that Chester [Bauer] was allowed into the community unsupervised." The letter concluded with the following admonition:

> Because Bauer is considered a Special Management inmate and not a Trusty, we can not allow him to have access to the community. We sure would like to keep Bauer there if you don't have problems with restricting his access to the community. He is not to be allowed out of the jail area unsupervised.

¶26 Some 24 days later, on April 28, 1995, Jailer Jim Doyle distributed the following memo to all jail employees:

> Control Officers:
>
> We need to establish some rules in dealing with Chester. First of all, everyone remember that he is still an inmate. He can not be hanging around in dispatch and the jailers office visiting. This has been happening a lot, especially at night. He comes out and hangs around dispatch when Kara is working. I don't think this is a good idea. The general public is not allowed to do this, so for sure an inmate shouldn't be. There are a lot of things that he is not supposed to see. The jail roster for one, information on the teletype for another. Lately if he needs the garage opened he just walks in and opens it. This cannot happen. There may be evidence or something in there that needs to be kept secure.
>
> I also found out that a few nights ago, Chester was given the jail keys to go turn the

radio off in male cell block. Do not give Chester the keys. The whole next day, all I heard from the other inmates, is how come an inmate has the jail keys, and that we should let them have them also. If word about this ever got to the public, it could really cause some problems. Chester is an inmate. What would have prevented him from unlocking the other inmates if he wanted to. We would have had some serious problems. I realize Chester is a nice person and is doing well here, and everybody likes him, but he is not an employee. He is a MSP inmate[.]

Remember, Chester is not to be outside of the Sheriff's Dept. without supervision. He must be monitored at all times if outside of this office. The prison has already said that if something were to happen, we would be responsible.

We will probably be getting another trustee from the prison one of these days. If he sees Chester acting like an employee, then he is going to act the same way. We don't need that.

I have already talked to him about the deal with the jail keys, and hanging around in the offices. Lets not let this kind of stuff happen. We don't want something to go wrong and end causing up some problems that we can't deal with.

Also Chester received his paperwork today from MSP, he was denied parole. So keep an extra close eye on him. I don't think he would try to leave, but I didn't think Bigby would either. I know this will be a let down for him.

Jim L. Doyle

¶27 The dissent argues that since the State knew that Bauer had access to the jailhouse keys, the threat to Pula was foreseeable. This contention is based upon Warden Mahoney's testimony that, in late March of 1995, Officer Schmidt brought it to his attention that Bauer had access to the keys. It is significant, however, that Warden Mahoney's testimony in this regard was inconsistent with the testimony of Officer Schmidt. Officer Schmidt testified as follows:

Q: Did you know that he had access to keys?

A: No, I did not.

Q: Did you ever know that?

A. No.

¶28 Candyce Neubauer also testified that she did not know that Bauer had access to the jail keys. Jailer Doyle did not learn of Bauer's access to keys until April 26 or 27, 1995, and, even then, he did not advise anyone from the State of that fact. He did, however, circulate the above memo, dated April 28, 1995, in which he specifically and emphatically advises his staff that Bauer was a MSP inmate and was not to have access to the keys. Clearly there was ample evidence before the jury from which it could conclude that Warden Mahoney was mistaken when he said that he had been advised by Schmidt in March of 1995 that Bauer had access to the keys. The above evidence would also explain why Neubauer's letter of April 4 did not address the issue of Bauer's access to the keys. First of all, there was no evidence that there had been an access to keys problem prior to April 4; secondly, Neubauer was never aware that Bauer had access to keys; and finally, even the jailer was not aware of this until April 27 or 28.

¶29 We conclude that the State offered sufficient evidence to submit the issue to the jury. Judgment as a matter of law was not appropriate. The District Court correctly denied Pula's Rule 50(a), M.R.Civ.P., motion.

> *Issue 3. Did the District Court's jury instructions and verdict form incorrectly instruct the jury on the law of intervening and superseding cause?*

¶30 This Court reviews jury instructions to determine whether the instructions as a whole fully and fairly instruct the jury on the law applicable to the case. *State v. Martin*, 2001 MT 83, ¶ 23, 305 Mont. 123, ¶ 23, 23 P.3d 216, ¶ 23.

¶31 Pula argues that the District Court's instructions on independent intervening causation were incorrect statements of the law as established by this Court in *Busta.* Whatever the merits of this argument, it is clear from the jury's verdict that it never even reached the question of an intervening or superseding cause.

¶32 Like the standard jury verdict form proposed by Pula herself, the District Court's special verdict form required the jurors to answer a series of questions on breach of duty, causation and damages; moving on to succeeding questions depending on their answer to the preceding question. On the first question-whether the State was negligent-the jury

answered "yes." However, in response to the next question on the special verdict form-whether the State's negligence was a cause of any injury or damage to Pula-the jury answered "no." Having answered this causation question in the negative, the form instructed the jury not to consider the third question-whether there was an intervening cause. Instead it instructed the jury to simply sign the form and notify the bailiff that it had reached its verdict.

¶33 The dissent contends that the jury verdict only makes sense if the jury, despite not having answered the special verdict question, found that the County's or Bauer's conduct was an independent intervening cause, thereby superseding the State's negligence. That, however, is not the only plausible explanation for the verdict. If the jury found that the letters from Neubauer to Blaine County officials (specifying no unsupervised community access) and the memo from the Blaine County jailer to his staff (to treat Bauer as an inmate with no more access to the jail keys) cut off any causal connection between the State's negligence and the attack on Pula, there was no necessity for the jury to go further and address the question of independent intervening cause.

¶34 Since the jury did not consider the issue of intervening cause in reaching its verdict, we conclude that the District Court's instructions on intervening cause had no effect on the outcome of the trial.

¶35 We will not reverse a civil cause by reason of any error where the record shows that the same result would have been attained had the error not been committed. Rule 14, M.R. App.P. See also *Stenberg v. Neel* (1980), 188 Mont. 333, 339, 613 P.2d 1007, 1011 (where the jury does not reach the issue of damages, no error can be predicated on damage instructions). The record indicates that the jury did not reach the question of intervening cause. Therefore, we will not assign error to the instructions addressing that issue.

## CONCLUSION

¶36 We conclude that the District Court properly denied Pula's motion in limine to exclude the State's evidence of an independent intervening cause of Pula's injuries. The State presented sufficient evidence on the issues of breach and causation to warrant sending the case to the jury and Pula's motion for a directed verdict was properly denied. Finally, the District Court's jury instruction on intervening cause, while not conforming to our suggestion in *Busta*, had no effect on the outcome of the trial. The verdict and judgment are affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/DOROTHY McCARTER

Honorable Dorothy McCarter, District

Judge, sitting in place of Justice Patricia Cotter

/S/ ED McLEAN

Honorable Ed McLean, District Judge,

sitting in the vacant seat of the Court

as of the date of submission

Justice Terry N. Trieweiler dissents.

¶37 I dissent from the majority's conclusions that there was sufficient evidence to submit the issue of independent intervening cause to the jury and that the Plaintiff suffered no harm from those instructions.

¶38 The jury found the State of Montana negligent. The only facts alleged as a basis for the State's negligence were that it failed to protect the Plaintiff by adequately controlling and supervising Chester Bauer, an inmate for whom the State was responsible. It is not logically possible for the State to have been negligent in the manner alleged and for that negligence not to have been a contributing cause of damage to the young woman that Bauer raped while under the State's presumed control. The only basis for finding that the State's omissions were not the cause of Plaintiff's damages was the Court's instruction that the chain of causation could be severed by the independent, intervening omissions of the

county or acts of Chester Bauer. Those instructions should not have been given because the intervening acts and omissions relied on by the State were completely foreseeable. Because they were given, the bizarre and unjust result in this case should be reversed.

## FACTUAL BACKGROUND

¶39 Chester Bauer is a sexual predator who was convicted of sexual intercourse without consent in 1983 and sentenced to the Montana State Prison. While at the Montana State Prison, in 1991, he was convicted of intimidation for trying to extort sexual favors from the wife of a prison employee by threatening her and her children. In addition to these two offenses, he was serving a ten-year sentence for aggravated assault and ten years for use of a dangerous weapon when, in 1994, he was transferred by the State of Montana to the Blaine County jail. Presumably because of the threat that he posed to others, he was denied parole on nine occasions-eight times prior to his transfer to Blaine County. Blaine County prison officials were advised that he had been classified as a minimum security inmate and they treated him accordingly by making him a trustee.

¶40 His freedom and mobility while in Blaine County first came to the attention of Montana State Prison officials after he was observed in street clothes, roaming freely about the Blaine County courthouse by Edward Schmidt, a state probation and parole officer. On March 21, 1995, he wrote to Mike Gersack, his supervisor, and sent a copy of his letter to Candyce Neubauer who was in charge of classification of Montana State Prison inmates. In his letter, he advised Gersack and Neubauer that Bauer was being treated as a trustee at the Blaine County jail and in that status, worked at various jobs in the city of Chinook. His work included repairs to private vehicles for which he received payment. He had no particular hours by which he had to return to the prison facility and, in fact, had a private vehicle at his disposal which had been loaned to him by one of the jailers.

¶41 Schmidt pointed out that when he observed Bauer, he was dressed in civilian clothes and that he had been advised by the undersheriff in Blaine County that Bauer had access to go and come as he pleased.

¶42 This information, as well as the fact that Bauer had access to jailhouse keys, was communicated to Mike Mahoney, the warden at the Montana State Prison. Mahoney admitted that he had knowledge of this information prior to Bauer's attack of Pula and that Bauer in fact was the State's responsibility. Mahoney gave the following testimony:

Q. This matter regarding Mr. Bauer's detention up here came to your attention in March of 1995, correct?

A. I believe that's correct.

Q. And it was brought to your attention because adult probation and parole officer Ed Schmidt expressed concerns about the fact that Mr. Bauer was even up here, didn't he?

A. My recollection is, Mr. Schmidt had made personal contact with inmate Bauer and was deeply troubled by the issues that he attended to in that conversation and notified the department of his concern.

Q. He saw a Montana State Prison inmate running around like a trustee, didn't he?

A. I believe that would be a fair observation or assessment, yeah.

Q. The prison requested him to look into it further and he reported back to you, did he not?

A. Yes, he did.

Q. And isn't it true that the information that was provided to you indicated that Mr. Bauer had freedom to come and go as he pleased?

A. In essence, that would probably be fair.

Q. And that he had complete access inside the jail and outside the jail at that point?

A. Again, with the custody level a lot to be desired.

Q. So he was free to roam around inside the jail, wasn't he?

A. From what I recall, yes, it sounds like he was.

Q. And you were aware of that?

A. At that point in time, yes, I was.

Q. And as well, he could leave the jail and go out into the community, correct?

A. Again, at that point in time, yes.

Q. And you also had concerns because there were problems with his access to keys, correct?

A. That's correct as well.

Q. And that came to your attention during this period in late March of 1995, correct?

A. All of those issues pretty much stemmed from Officer Schmidt's contact.

Q. And those concerns prompted a review by you and Candyce Neubauer and William Pohjola at the prison, correct?

A. That's correct.

Q. That resulted in the classification summary or a re-classification document; is that correct?

A. That's correct.

. . . .

Q. Okay. And your recommendation after going through this was what, Mr. Mahoney?

A. If you're referring to the face sheet?

Q. Yes.

A. I wrote at the bottom that it would appear that the placement does not accurately address public safety and recommend we re-evaluate and potentially return to the Montana State Prison.

Q. And that decision never was pursued, was it?

A. No, sir, it was not.

Q. Mr. Bauer was maintained at the Blaine County jail, correct?

A. That's correct.

Q. And the concerns that you had regarding his freedom inside and outside the jail, they formed the basis for this recommendation of yours, didn't they?

A. Initially, yes, they did.

Q. And that would include not just the freedom, but his access to keys, correct?

A. Basic security practices.

Q. And the freedom to go inside the jail and outside the jail whenever he wanted, that's a fundamental breakdown in a detention facility, would you agree?

A. That would probably be a fair assessment, that's correct.

. . . .

Q. That inmate is still your responsibility, he's a Montana State Prison inmate, correct?

A. Still an inmate.

Q. Okay. You can't change that status, can you, by transferring him to another facility?

A. No, sir, I cannot.

Q. And you can't also change his court commitment by transferring him to another facility?

A. No, that certainly exceeds the bounds and authority of the warden.

Q. Now, the response that was given to these concerns about access to keys and complete freedom up here in Blaine County, that ended up being Candyce Neubauer's letter to Sheriff Harrington, correct?

A. I believe that's correct.

. . . .

Q. And that letter indicates that the concern of the prison is his ability to access the community, correct?

A. I think the public safety issue was the theme, that would be correct.

Q. There's nothing in that letter that addressed or dealt with the problems with Mr. Bauer's access to keys at this facility, is there?

A. No, there's nothing in here that states specifically keys.

Q. And that's a concern that as a prison official you would agree that you should specifically address with the detention facility?

A. Most definitely it's to be addressed. It just wasn't placed in there.

Q. And, in fact, it wasn't placed in any written document, was it?

A. To the best of my knowledge, no, it was not.

¶43 In other words, the State of Montana admitted responsibility for the detention and supervision of Chester Bauer. It admitted that those responsible for him knew he was not being detained in a secure fashion and had freedom to not only move about the community but freedom to roam the jail facility and access to keys at the jail. It admitted that these breaches of security were a threat to public safety and it admitted that the only activity it made any effort to curtail was Bauer's freedom of movement within the community of Chinook.

¶44 This was the situation to which Wendy Pula was exposed when brought by force to be locked in a cell with no freedom of movement on May 25, 1995, for failing to appear on a

charge of possessing alcohol as a minor, an offense for which we have since held a minor cannot be jailed. *State v Bauer*, 2001 MT 248, ¶ 33, 307 Mont. 105, ¶ 33, 36 P.3d 892, ¶ 33.

¶45 However, because of Bauer's freedom of movement, he was able to retrieve jailhouse keys, open the cell door of a minor, take her to his jail cell and force her to have intercourse with him without consent. How, under these circumstances, can it be seriously argued that the acts of this sexual predator were unforeseeable is mystifying.

¶46 The State's response is that because of Candyce Neubauer's letter, it had a right to assume that Bauer was under proper supervision and his freedom of movement had been curtailed. However, Neubauer's letter was written on April 4, 1995, and as acknowledged by Mahoney, was limited in its criticism to Bauer's unsupervised presence in the community. It made no suggestion that his freedom of movement at the Blaine County jail be restricted or that his access to Blaine County jail keys be denied.

¶47 We have previously held that intervening criminal acts are not always unforeseeable, *Estate of Strever v. Kline* (1996), 278 Mont. 165, 178-79, 924 P.2d 666, 673-74, and that sometimes intervening acts are foreseeable as a matter of law, *Cusenbary v. Mortensen,* 1999 MT 221, ¶ 37, 296 Mont. 25, ¶ 7, 987 P.2d 351, ¶ 37.

¶48 In *Mills v. Mather* (1995), 270 Mont. 188, 198, 890 P.2d 1277, 1283-84, we noted that:

> There are . . . situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct . . . .

(Quoting Restatement (Second) of Torts § 302B cmt. e (1965)).

¶49 The facts in this case present just such a circumstance. The State of Montana had a special responsibility to protect Pula and other potential victims from the harm that Bauer inflicted by his intentional conduct.

¶50 Furthermore, based on the previously mentioned admissions by the State, the threat posed by Bauer was completely foreseeable and the county's total failure to protect others

from him was well known to the State. Therefore, neither Bauer's conduct nor the county's conduct could have served as an independent intervening cause protecting the State from liability for its negligence.

¶51 For example, in *Cusenbary* the plaintiff was injured when an intoxicated patron left the bar, got in his vehicle and drove the vehicle into the bar. The defendant bar owner proposed that the district court instruct the jury that an independent intervening cause severed the chain of causation. The district court declined to do so and the jury returned a verdict for the plaintiff. On appeal, we affirmed the district court and stated that:

> [T]his case involves the allegation that the chain of causation was severed by an independent intervening act. However, not all intervening acts are independent. Those that are foreseeable do not break the chain of causation. In other words, if one of the reasons that makes a defendant's act negligent is a greater risk of a particular harmful result occurring, and that harmful result does occur, the defendant is generally liable. The test is based on foreseeability. [Citation omitted.]
>
> . . . .
>
> In this case, unlike the act of leaving a vehicle unlocked, the act of Mortensen in serving alcohol to Wells is the very act which caused the conduct that resulted in the injury to Cusenbary. The consequences of serving alcohol to a person who is visibly intoxicated are reasonably foreseeable precisely because of the causal relationship between serving alcohol and drunken conduct. Wells' drunken conduct was not freakish, bizarre, or unpredictable as Mortensen asserts. Rather, drunken conduct is the expected, predictable, and therefore reasonably foreseeable outcome of serving alcohol to a person who is already intoxicated.

*Cusenbary, 296 Mont. at 32-33, 987 P.2d at 355-56.*

> Accordingly, we conclude that as a matter of law Wells' conduct of driving a vehicle while intoxicated, through the wall of the Town Tavern, was a foreseeable intervening cause that did not serve to supersede or break the causal chain between Mortensen's original negligence and the injury to Cusenbary.

*Cusenbary, 296 Mont. at 37, 987 P.2d at 358.*

¶52 Likewise in this case, the lack of proper supervision of Bauer, a known rapist, who was denied parole on nine occasions because of the known risk that he presented, was the very omission that allowed him to assault the Plaintiff. The consequences of failing to supervise him and of permitting him to freely roam the jailhouse were reasonably foreseeable because they were the exact reason that he had been imprisoned in the first place.

¶53 Finally, it is not correct that the Plaintiff suffered no prejudice from the District Court's erroneous instructions on intervening cause. The jury was instructed that:

> If you find that a negligent act of any other person or entity caused the injury and damage to plaintiff and that this negligent act of other persons or entities occurred after any negligent act of Defendant State of Montana and that this negligent act . . . could not reasonably be foreseen by Defendant State of Montana to happen in the natural sequence of events, the later negligent conduct of this third person or entity is an independent intervening and superseding cause of the plaintiff's injury and damage.
>
> If you find that the conduct of the third person or entity was the intervening and superseding cause of injury and damage to plaintiff, then you must return your verdict for Defendant State of Montana.

Court's Instruction No. 18.

¶54 Supersede is defined in Webster's Ninth New Collegiate Dictionary as " 2: to take the place, room, or position of; 3: to displace in favor of another." We have in fact stated in our opinions that an independent intervening cause cuts off the chain of causation. Based on either the standard definition of "supersede" or our own case law, it was perfectly consistent for the jury to conclude that if the county's or Bauer's conduct was an independent intervening cause, then the State's negligence was not the cause of Pula's damages. It does not matter that the jury did not get to the final question about independent intervening causes. The Court's instruction was prejudicial and was the only possible explanation for the jury's finding that the State negligently failed to supervise Bauer but that while he was roaming freely about the jail with access to keys, that failure to supervise did not cause his assault on Wendy Pula.

¶55 The facts of this case shockingly demonstrate an avoidable tragedy caused by the

failure of state and local prison officials to protect a young woman from a known sexual predator who had been placed in the State's custody because of a series of violent criminal offenses. Wendy Pula was an underage girl imprisoned because she was unable to post bond to secure her appearance on a charge of being a minor in possession of alcohol. Had she been convicted of being a minor in possession of alcohol, she could not have been imprisoned for that offense. *See Bauer*, ¶ 33. Yet while she was in prison for her inability to post bond, she was raped and assaulted by a dangerous predator for whom the State was responsible only to be told that in spite of the State's negligence, she is entitled to no damages. This result cannot be explained on any evidentiary or logical basis. I conclude that it can only be attributable to the District Court's erroneous instruction to the jury that the State could be relieved of liability by an intervening independent act. Since there was no intervening act which was "unforeseeable," the defense was inapplicable and the District Court erred by submitting those instructions to the jury. For these reasons, I would reverse the judgment of the District Court and I dissent from the majority's decision to do otherwise.

/S/ TERRY N. TRIEWEILER

Justice James C. Nelson joins in the foregoing dissent.

/S/ JAMES C. NELSON