No. 04-309

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 121

LEROY and JANIE TRIPP,

> Plaintiffs and Appellants,

v.

JELD-WEN, INC., d/b/a OREGON
STRAND BOARD,

> Defendant and Respondent.

APPEAL FROM:     The District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV 97-84690,
Honorable Douglas G. Harkin, Presiding Judge

COUNSEL OF RECORD:

> For Appellants:

> > Lon J. Dale and Christian T. Nygren, Milodragovich, Dale,
Steinbrenner & Binney, P.C., Missoula, Montana

> For Respondent:

> > Richard N. Sieving, Sieving & Momjian, LLP, Sacramento, California

> > Ronald A. Bender, Worden Thane P.C., Missoula, Montana

Submitted on Briefs:  January 12, 2005

Decided:  May 11, 2005

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     Leroy and Janie Tripp appeal from the judgement of the District Court. We affirm in part, reverse on the question of attorney fees, and remand for further proceedings consistent with this Opinion.

¶2     We address the following issues on appeal:

¶3     1. Whether the District Court erred in refusing to allow the Tripps' expert to testify concerning other incidents of failure involving COMPLY.

¶4     2. Whether the District Court erred in allowing evidence concerning a settlement entered into by the third-party contractor.

¶5     3. Whether the District Court erred in allowing the expert testimony of Stephen Zylkowski concerning industry standards.

¶6     4. Whether the District Court erred in giving Jeld-Wen's proposed jury instruction regarding negligent misrepresentation.

¶7     5. Whether the District Court erred in awarding attorney fees under the Montana Consumer Protection Act.

## FACTUAL AND PROCEDURAL BACKGROUND

¶8     In 1995 the Tripps contracted with Howard Construction (Howard) to build their home. The Tripps sought a floor that did not "squeak." They ordered plywood as the sub-flooring, but instead received a product known as COMPLY Sturd-I-Floor. COMPLY is manufactured by Oregon Strand Board, which is owned by Respondent Jeld-Wen, Inc. In installing the product, Howard utilized staples, something the manufacturers' specifications

2

specifically said to avoid. Also, during construction, the product was left out in the open and exposed to rain. According to the Tripps, they were reassured by Jeld-Wen's advertisements for COMPLY that the use of staples and exposure to rain were acceptable because the ads indicated that COMPLY was an acceptable substitute for plywood.

¶9 When the home was finished, the Tripps moved in and found that their floor "squeaked" after all. After complaining to Jeld-Wen and unsuccessfully waiting to see if the noise abated, the Tripps filed suit against Jeld-Wen, claiming negligence, breach of warranty, and unfair or deceptive trade practices under the Montana Consumer Protection Act (MCPA). Jeld-Wen then sued Howard as a third-party plaintiff.

¶10 Before trial, the Tripps settled with Howard. Because of this the court dismissed Jeld-Wen's suit against Howard. Evidence of the settlement was later used by Jeld-Wen to impeach the testimony of Howard's owner, who testified for the Tripps. Also before trial, Jeld-Wen disclosed an expert witness, but then shortly before trial substituted another expert witness, Stephen Zylkowski, who until then had only been listed as a fact witness. During trial, Jeld-Wen objected to the Tripps' expert witness, Dr. Burke, testifying to other incidents of homeowner dissatisfaction with COMPLY. The District Court sustained this objection. In addition, Jeld-Wen submitted a proposed jury instruction regarding the standard for negligent misrepresentation, a theory the Tripps had not pled in their complaint. The instruction was given over the Tripps' objection.

¶11 The jury returned a verdict in favor of Jeld-Wen and the court entered judgment accordingly. Following that, the District Court awarded attorney fees to Jeld-Wen, in

accordance with its interpretation of the MCPA. From the judgment and the award of attorney fees, the Tripps bring this appeal.

## STANDARD OF REVIEW

¶12 We review a district court's evidentiary rulings for abuse of discretion. *Kiely Const., L.L.C. v. City of Red Lodge*, 2002 MT 241, ¶ 92, 312 Mont. 52, ¶ 92, 57 P.3d 836, ¶ 92 (citing *Finstad v. W.R. Grace & Co.*, 2000 MT 228, ¶ 43, 301 Mont. 240, ¶ 43, 8 P.3d 778, ¶ 43). "'The test for abuse of discretion is whether the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice.'" *Kiely*, ¶ 92 (quoting *Jarvenpaa v. Glacier Elec. Coop., Inc.*, 1998 MT 306, ¶ 13, 292 Mont. 118, ¶ 13, 970 P.2d 84, ¶ 13). The same standard applies when we review a discovery matter, *Hawkins v. Harney*, 2003 MT 58, ¶ 17, 314 Mont. 384, ¶ 17, 66 P.3d 305, ¶ 17; jury instructions, *Montana Dep't of Transp. v. Simonson*, 2004 MT 60, ¶ 14, 320 Mont. 249, ¶ 14, 87 P.3d 416, ¶ 14 (citing *Harwood v. Glacier Elec. Coop., Inc.* (1997), 285 Mont. 481, 487, 949 P.2d 651, 655); or an award of attorney fees, *Lewistown Propane Co. v. Moncur*, 2002 MT 349, ¶ 19, 313 Mont. 368, ¶ 19, 61 P.3d 780, ¶ 19.

## DISCUSSION

## ISSUE ONE

¶13 *Whether the District Court erred in refusing to allow the Tripps' expert to testify concerning other incidents of failure involving COMPLY.*

¶14 At trial, the Tripps wanted their expert witness, Dr. Edwin Burke, to testify to other incidents of COMPLY failing to function properly. The District Court allowed Dr. Burke

4

to testify to experiments he had conducted on pieces of COMPLY as well as to the experience of another witness, Dean Gingerich, who had previously testified that he also had a "squeaky" COMPLY floor. However, the court did not allow Dr. Burke to speak to the experiences of other third-parties with COMPLY floors. The court agreed with Jeld-Wen that the basis for Dr. Burke's opinion had already been given through other testimony. The court ruled that it would not allow Dr. Burke to testify to these third-parties' experiences because under Rule 403, M.R.Evid., the "prejudicial effect outweigh[ed] the probative value." The Tripps argue that the court abused its discretion, and that Dr. Burke should have been allowed to testify concerning other incidents of COMPLY failure because (1) they formed the basis for Dr. Burke's opinion, and (2) they were admissible to demonstrate notice.

¶15     The Tripps are correct in stating that an expert witness may testify to evidence that might be otherwise inadmissible. *See* Rule 703, M.R.Evid. ("If of a type reasonably relied upon by experts in the particular field in forming opinions . . . the facts or data need not be admissible in evidence."). *See also Azure v. City of Billings* (1979), 182 Mont. 234, 255, 596 P.2d 460, 472 ("'The rationale in favor of the admissibility of expert testimony based on hearsay is that the expert is fully capable of judging for himself what is or is not a reliable basis for his opinion.'" (quoting *United States v. Sims* (9th Cir. 1975), 514 F.2d 147, 149 )). However, Rule 703, as with all rules of evidence, may collide with Rule 403, M.R.Evid. *State v. Van Dyken* (1990), 242 Mont. 415, 428, 791 P.2d 1350, 1358.

¶16    Rule 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The Tripps wanted Dr. Burke to comment on non-witness third-parties' experiences with COMPLY. Since such testimony might improperly induce the jury into thinking COMPLY is rampantly defective, there was a danger that it would unfairly prejudice the jury.

¶17    Under Rule 403 this danger must be weighed against the testimony's probative value. Jeld-Wen argues that the probative value of the testimony was minimal because Dr. Burke had already given a reliable basis for his opinion. He had, in fact, already produced detailed testimony on his testing of COMPLY and was allowed to testify to the experience of homeowner Dean Gingerich. Gingerich appeared as a witness and was subjected to cross-examination by Jeld-Wen. If Dr. Burke had been allowed to testify to the experiences of other third-parties whom Jeld-Wen had not had the opportunity to cross-examine, there would have been a heightened danger that Dr. Burke's testimony about their experiences would be treated as unrebutted substantive evidence. Furthermore, although the court specifically allowed the Tripps the opportunity to question Dr. Burke about the experiences of Dean Gingerich, the Tripps declined to do so. Having chosen not to question Dr. Burke about the experiences of witness Gingerich, the Tripps' contention that Dr. Burke should have been allowed to testify about the experiences of third-party non-witnesses rings hollow. Therefore, with foundational testimony already in evidence, Jeld-Wen is correct in arguing

6

that the probative value of Dr. Burke's testimony on the experiences of non-witness third-parties would likely have been minimal. We conclude the court did not abuse its discretion.

¶18   The Tripps also argue that Dr. Burke's testimony regarding third-party experiences with COMPLY was admissible to demonstrate that Jeld-Wen had notice of COMPLY's alleged defectiveness. This argument similarly fails. As the Tripps note in their briefs, we follow a "relaxed" standard when evidence is offered to demonstrate notice rather than liability. *Kissock v. Butte Convalescent Ctr.*, 1999 MT 322, ¶ 17, 297 Mont. 307, ¶ 17, 992 P.2d 1271, ¶ 17. However, the standard only applies "so long as 'the differences [between different accidents] can easily be brought out on cross-examination and understood by the jury.'" *Kissock*, ¶ 18 (citing Mueller & Kirkpatrick, *Modern Evidence* § 4.8, at 283). Had the District Court allowed Dr. Burke to testify to the non-witness third-parties' experiences, Jeld-Wen would have been denied the opportunity to cross-examine the third-parties as to whether their experiences with COMPLY were similar enough to constitute notice to Jeld-Wen. The opportunity to cross-examine Dr. Burke about his brief conversations with the non-witness third-parties would not allow Jeld-Wen to "easily" demonstrate any difference between the third-party experiences and the Tripps' experience. In light of this, we conclude that the court did not abuse its discretion in excluding the testimony.

## ISSUE TWO

¶19   *Whether the District Court erred in allowing evidence concerning a settlement entered into by the third-party contractor.*

7

¶20    The Tripps contend that evidence of their settlement with their contractor, Howard, was improperly allowed by the District Court when Jeld-Wen cross-examined Howard's owner. Rule 408, M.R.Evid., does not allow for evidence of settlements in order to prove or disprove liability. However, as the court below recognized, the witness was not asked about the settlement in order to prove any issues of liability, but to illustrate the bias of the witness. This is permissible under Rule 408. In addition, the Tripps argue that in inquiring into Howard's settlement, Jeld-Wen was improperly trying to apportion liability to a person not involved in the lawsuit. *See Plumb v. Fourth Judicial Dist. Court* (1996), 279 Mont. 363, 379, 927 P.2d 1011, 1021. Again, since Jeld-Wen was not seeking to apportion liability, but instead seeking to show bias, the District Court did not abuse its discretion in allowing inquiry into the settlement. *See Pula v. State*, 2002 MT 9, ¶ 17, 308 Mont. 122, ¶ 17, 40 P.3d 364, ¶ 17 (allowing evidence of third-party negligence to show causation, not liability).

¶21    The Tripps argue in the alternative that even if it is permissible to inquire into a settlement for purposes of illustrating bias, such inquiry must be kept within the bounds of necessity. Specifically, they point to Jeld-Wen's inquiring into the *amount* of the settlement. This, they continue, goes beyond merely revealing the existence of a settlement and into the specifics of the settlement itself. Contrary to this argument, however, we have held that "[t]here will be times . . . when the jury should be informed of the amount of the settlement." *Azure*, 182 Mont. at 247, 596 P.2d at 467. One such time was present here: The amount Howard settled for was very similar to the amount that Howard's owner earlier had

contended it would have cost to repair the floor. Because he settled at that amount, Jeld-Wen could argue that he was inconsistent when he testified to a different, much greater, repair figure. Therefore, inquiry into the amount was pertinent to the credibility of the witness and the court did not abuse its discretion by allowing the testimony.

## ISSUE THREE

¶22 *Whether the District Court erred in allowing the expert testimony of Stephen Zylkowski concerning industry standards.*

¶23 Jeld-Wen's witness Zylkowski testified regarding industry standards. Zylkowski was a substitute for Gregg Froman, a previously listed expert witness. Unlike Froman, Zylkowski did not have personal knowledge of the Tripp floor. Since Zylkowski was added as a witness late in the course of litigation, was only designated as an expert witness shortly before trial, and was to testify on slightly different matters than Froman, the Tripps argue that the District Court should not have allowed him to testify.

¶24 The Tripps point us toward cases where we have upheld the exclusion of expert testimony on the grounds that the experts were not fully disclosed in advance of trial or that a party abused a discovery deadline. *See, e.g.*, *Seal v. Woodrows Pharmacy*, 1999 MT 247, ¶ 25, 296 Mont. 197, ¶ 25, 988 P.2d 1230, ¶ 25; *Rocky Mountain Enters., Inc. v. Pierce Flooring* (1997), 286 Mont. 282, 299, 951 P.2d 1326, 1336-37. However, these cases do not necessarily help the Tripps' cause because in this case the District Court allowed the expert to testify.

¶25 In this case, although Zylkowski was not disclosed as a witness until late in the litigation, he was disclosed to the Tripps six months before trial. Although his expert status was not made known until two weeks before trial, the Tripps were on notice, through the District Court's Pre-Trial Order, that the prior witness disclosures could be supplemented at a later time. These facts are similar to *Ostermiller v. Alvord* (1986), where the plaintiff objected because a treating physician, although listed as a witness, had not been listed as an *expert witness*. 222 Mont. 208, 212, 720 P.2d 1198, 1201. Since plaintiff did not contend that he was surprised by the doctor's testimony, we characterized his argument as "hyper-technical," and affirmed the District Court. *Ostermiller*, 222 Mont. at 212, 720 P.2d at 1201. Given that, here, the Tripps had six months notice that Zylkowski was a witness and two weeks notice that he was an expert witness, we conclude that the District Court did not abuse its discretion.

## ISSUE FOUR

¶26 *Whether the District Court erred in giving Jeld-Wen's proposed jury instruction regarding negligent misrepresentation.*

¶27 The Tripps contend that the District Court abused its discretion in giving Jeld-Wen's jury instruction (Instruction 19) detailing the elements of negligent misrepresentation. The Tripps argue that since they did not assert a claim for negligent misrepresentation, the instruction confused the jury in its consideration of the Tripps' negligence and unfair trade practices claims.

¶28 In reviewing jury instructions, not only do we look for abuse of discretion, but "[t]he party assigning error . . . must show prejudice in order to prevail, and prejudice will not be found if the jury instructions in their entirety state the applicable law of the case." *Christofferson v. City of Great Falls*, 2003 MT 189, ¶ 9, 316 Mont. 469, ¶ 9, 74 P.3d 1021, ¶ 9 (citing *Kiely*, ¶ 62). It is undisputed that Instruction 19 was a correct statement of law. However, it is also true that Instruction 19 was sandwiched in the middle of Instructions 17-20, and that 17, 18, and 20 speak only of "negligence," not of "negligent misrepresentation."

¶29 Jeld-Wen counters by pointing out that although the Tripps may not have pled negligent misrepresentation in their complaint, during the trial they repeatedly contended that they had relied on representations by Jeld-Wen or its supplier. The record supports Jeld-Wen in this regard. Furthermore, the fact that the Tripps repeatedly claimed that misrepresentations led them to use the COMPLY product demonstrates that their negligence claim could also be characterized as a negligent misrepresentation claim. The Tripps did not argue at trial that Jeld-Wen negligently manufactured or transported COMPLY. Instead, their contention was that Jeld-Wen misrepresented how COMPLY stands up when installed. Therefore, "the jury instructions in their entirety state the applicable law of the case," and we cannot conclude that the District Court abused its discretion in including an instruction for negligent misrepresentation among the more general negligence instructions. *Christofferson,* ¶ 9.

¶30 The Tripps also argue that Instruction 19, with its requirement of intent to deceive, confused the jury in considering the Tripps' separate unfair trade practices claim, which has

11

no scienter requirement. This argument has no merit. First, negligent misrepresentation does not require "intent to deceive" but, as Instruction 19 plainly states, intent to induce reliance on a representation without any reasonable ground to believe that it is true. In other words, it requires *negligence* not *intent*. Second, all three claims were explicitly divided into three different sets of instructions. Clearly, Instruction 19 was to be considered in the context of the negligence claim and not in the unfair trade practices claim. We conclude the District Court did not abuse its discretion.

## ISSUE FIVE

¶31 *Whether the District Court erred in awarding attorney fees under the Montana Consumer Protection Act.*

¶32 Having successfully defended against the Tripps' claims of unfair or deceptive trade practices under the MCPA, Jeld-Wen requested attorney fees pursuant to the Act. The MCPA states, in pertinent part, "In any action brought under this section, the court may award the prevailing party reasonable attorney fees incurred in prosecuting or defending the action." Section 30-14-133(3), MCA. The District Court concluded that Jeld-Wen was thus entitled to reasonable attorney fees "in defending the Consumer Protection aspect of the action . . . ."

¶33 We applied this provision in the context of a prevailing defendant in *Dilleree v. Devoe* (1986), 223 Mont. 47, 54, 724 P.2d 171, 175-76, where we concluded that a party does not have to win a *claim* brought under the MCPA, but only prevail in an *action* brought under the Act. We did not inquire into the separate question of what standard should be followed

12

in making an attorney fees award to a prevailing defendant under the Act.  The Tripps urge us to adopt a "bad faith" standard so as to not create a chilling effect on consumers bringing meritorious claims.  We conclude that there is merit in the Tripps' argument, but that we should adopt an intermediate standard between "bad faith" and "prevailing party."

¶34     For guidance we look to standards utilized in awarding attorney fees under statutes very similar to the MCPA.  Title VII of the Civil Rights Act of 1964 allows an award of attorney fees as follows: "In any action or proceeding under this title the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . ."  42 U.S.C. § 2000e-5(k) (1977).[1]  The United States Supreme Court interpreted this language in the context of an award to a defendant in *Christiansburg Garment Co. v. Equal Employment Opportunity Commission* (1978), 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d. 648.  It held that the language did not apply to plaintiffs and defendants in the same way.  When awarding a plaintiff attorney fees a court is doing so "to vindicate 'a policy that Congress considered of the highest priority'" and against a "violator of federal law."  *Christiansburg*, 434 U.S. at 418, 98 S.Ct. at 699, 54 L.Ed.2d at 655 (quoting *Newman v. Piggie Park Enters.* (1968), 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263, 1265).  However, when awarding a defendant attorney fees, "quite different equitable considerations" are relevant.  *Christiansburg*, 434 U.S. at 419, 98 S.Ct. at 699, 54 L.Ed.2d at 655.  An example of these different considerations is "to protect defendants from burdensome litigation having no legal

---

[1]The language has been amended since *Christiansburg*, but it is essentially the same today.

or factual basis." *Christiansburg*, 434 U.S. at 420, 98 S.Ct. at 700, 54 L.Ed.2d at 656. Thus, although the reasons for awarding prevailing plaintiffs and prevailing defendants reasonable attorney fees are significant for each class of litigant, the reasons for granting attorney fees to a prevailing plaintiff are more compelling since they serve to further the public policy embodied in the legislation. Therefore, the standard applied to plaintiffs and defendants should not be the same.

¶35 In *Christiansburg* the losing plaintiff asked the Court to adopt "bad faith" as the standard in awarding attorney fees to a prevailing defendant. The Court declined. It reasoned that even under the traditional American rule where parties generally are responsible for their own legal fees, courts can award attorney fees if the litigation is brought in "bad faith." *Christiansburg*, 434 U.S. at 419, 98 S.Ct. at 699, 54 L.Ed.2d at 655. Therefore, "if that had been the intent of Congress, no statutory provision would have been necessary . . . ." *Christiansburg*, 434 U.S. at 419, 98 S.Ct. at 699, 54 L.Ed.2d at 655. Instead, the Court adopted an intermediate standard, holding that "a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Christiansburg*, 434 U.S. at 421, 98 S.Ct. at 700, 54 L.Ed.2d at 657. In addition, it cautioned that just because a plaintiff loses a case does not mean that this standard has been met.

¶36 We adopted the view of *Christiansburg* in interpreting the attorney fees provision of the Montana Human Rights Act (MHRA). *McCann v. Trustees, Dodson School Dist.* (1991),

14

249 Mont. 362, 364-65, 816 P.2d 435, 437. In reviewing the award of attorney fees to the defendant school district, we cited § 49-2-505(4), MCA (1991) (now § 49-2-505(7), MCA), which states, "The prevailing party in a hearing under this section may bring an action in district court for attorneys' fees. The court in its discretion may allow the prevailing party reasonable attorney fees." Citing the important interests at stake–civil rights–and the manner in which the statute is enforced–lawsuits brought by private citizens–we determined that the intermediate standard of *Christiansburg* should apply. *McCann*, 249 Mont. at 364-65, 816 P.2d at 437.

¶37     The attorney fees language of § 30-14-133(3), MCA, is substantially similar to that of the MHRA. The rationales for applying the *Christiansburg* standard are also applicable. First, the purpose of the MCPA is "to protect the public from unfair or deceptive practices . . . ." *Plath v. Schonrock*, 2003 MT 21, ¶ 28, 314 Mont. 101, ¶ 28, 64 P.3d 984, ¶ 28. While perhaps not rising to the heights of the MHRA, this purpose is of a high legislative priority. Second, the MCPA is enforced by private litigants. Thus, the often tenuous financial position of private plaintiffs must be taken into account when deciding on a standard for awarding attorney fees. Indeed, a preference for protecting the monetary interests of plaintiffs, and not defendants, is evidenced by the Act's treble damages provision. Section 30-14-133(1), MCA. Therefore, we conclude that an award of attorney fees under the MCPA should be made under the same standard as that of the MHRA. When faced with a successful defendant, a district court should only award attorney fees "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even

15

though not brought in subjective bad faith." *Christiansburg*, 434 U.S. at 421, 98 S.Ct. at 700, 54 L.Ed.2d at 657.[2]

¶38    Because the District Court did not have the benefit of the *Christiansburg* standard, we affirm issues One through Four, reverse on the issue of attorney fees, and remand for further proceedings consistent with this Opinion.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ JOHN WARNER
/S/ BRIAN MORRIS

---

[2]Other courts have applied a similar analysis in deciding whether to apply *Chrstiansburg* to consumer protection statutes. *See Vill. of Palm Springs v. Ret. Builders* (Fla. App. 1981), 396 So.2d 196, 198 (adopting *Christiansburg* standard for a utility rate consumer protection statute); *State v. Black* (Wash. 1984), 676 P.2d 963, 971 (declining to apply *Christiansburg* standard to a consumer protection statute when the *State Attorney General* brings suit *because* of the "powerful civil litigation resources" available to the State).

Justice James C. Nelson dissents.

¶39    I dissent from our decision as to Issues One, Two, and Four.  I would reverse and remand for a new trial.  I would not address Issues Three and Five.

¶40    Before addressing these issues, however, it is fair to point out that our Opinion does not adequately describe the so called "squeaks" that developed in the Tripps' home as a result of the failure of the COMPLY product.  Floor squeaks in a residential structure are usually considered a minor annoyance.  The "squeaks" at issue here, however, were anything but.  Excerpts from the trial transcript more accurately convey the substantial noise the was forced upon the Tripps in this case.

¶41    At trial, Mr. Tripp testified that the "squeaks" emanating from the floor of the walk-in closet were loud enough to wake a person who was sleeping in the adjacent bedroom.  Mrs. Tripp testified "when somebody says that it's a creak or it's a squeak, that's not what it is.  When your dog walks over it, and you can hear it, when a forty-pound nephew or niece walks across it and asks you what - what's wrong with the floor."  Further, Mrs. Tripp testified "[i]t's just horrible.  I'm embarrassed to have people come in.   . . . [I]t's not a squeak, it's not, you know, a little creak, it's a noise."

17

¶42     Further, our Opinion fails to mention that the Tripps sought to purchase strong and, pointedly, noise-proof flooring material because of the possibility that Mrs. Tripp could someday be confined to a 200 pound electric wheelchair because of her sixteen year struggle with rheumatoid arthritis.  Our Opinion simply does not do justice to the problem that prompted the Tripps' lawsuit against Jeld-Wen.

¶43     Turning next to our resolution of the issues, as to Issue One,  I would hold that the District Court abused its discretion by refusing to allow the Tripps' expert, Dr. Edwin Burke, to testify concerning other incidents of failure of the COMPLY product as the basis for his opinion.  Our Opinion holds that the District Court did not abuse its discretion in excluding this testimony because the probative value would likely have been minimal.  The District Court ruled that the witnesses's other-incidents testimony would not be admitted because Dr. Burke had already given a reliable basis for his opinion and because of the danger of unfair prejudice, given that the testimony might improperly induce the jury into thinking that COMPLY is rampantly defective.

¶44     Our affirmance of the District Court is based on Rule 403, M.R.Evid., which provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  A proper application of Rule 403, M.R.Evid., demonstrates that the District Court abused its discretion and that we have erred in upholding the court's decision.

¶45     First, the probative value of the excluded testimony was considerable for several reasons.  Most notably, this testimony was an integral part of the basis for Dr. Burke's expert

18

opinion. When asked why he would consider other incidents of failure of the COMPLY product in forming his opinion, Dr. Burke testified:

> Well, first and foremost, I want to make certain that the reported problem is not isolated . . . that it's not something that is only seen at this one location. And I'm interested - a person doing this type of work would be interested in knowing if - if there were other situations, that would allow for more, um, general knowledge to be gathered about - about the product, about the effects of the precipitation, or any of the other factors that could come into play here.

Additionally, the circumstances surrounding these other incidents were substantially similar to those in this case. As with the Tripps' house, the COMPLY product used in these other instances produced "squeaky" floors after being exposed to weather during construction. These were precisely the circumstances here. Furthermore, the excluded testimony would have assisted the jury in properly evaluating Dr. Burke's expert opinion by providing a more complete understanding of the basis of his opinion. It is clear that Dr. Burke found these other incidents of problems with the COMPLY product to be indicative and predictive of the product's failure when exposed to weather conditions during construction.

¶46     Second, the danger of unfair prejudice posed by this testimony was minimal because Dr. Burke's testimony could have been adequately challenged and clarified with thorough cross-examination. The Court concludes that this testimony could "improperly induce the jury into thinking COMPLY is rampantly defective . . . ." Unfortunately, it may just be that the COMPLY product is rampantly defective under the conditions at issue in this case and present in the other incidents. If so, it was the jury's prerogative to reach that conclusion based on the complete testimony of Dr. Burke. The trial court's ruling and our resolution

19

of this issue does not properly respect the role of cross-examination with regard to disclosure of the basis of an expert's opinion. We have previously stated that cross-examination is the proper means by which to reveal weaknesses in the basis of an expert's opinion. *Hunsaker v. Bozeman Deaconess Found.* (1978), 179 Mont. 305, 323, 588 P.2d 493, 504. Here, the jury should have been allowed to evaluate the complete basis of Dr. Burke's opinion, and Jeld-Wen would have had the opportunity to demonstrate weaknesses therein through vigorous cross-examination.

¶47 Under Rule 403, M.R.Evid., the probative value of the excluded testimony was not substantially outweighed by the danger of unfair prejudice. Indeed, the District Court's exclusion of this testimony severely prejudiced the Tripps because Dr. Burke's opinion and the basis for his conclusions was such an integral part of their case. I would, therefore, hold that the District Court erred and abused its discretion in refusing to allow the testimony at issue. I would reverse and remand for a new trial.

¶48 As to Issue Two, I would hold that the District Court abused its discretion in allowing evidence of the Tripps' settlement with Howard. We have time and time again stated that Montana law favors compromise and settlement. In *State ex rel. Deere & Co. v. District Court* (1986), 224 Mont. 384, 730 P.2d 396, we stated:

> "The law favors compromises. This is especially true in tort actions, not only because they relieve the labors of the courts, and avoid expense, but also because, where the parties agree between themselves upon a settlement of the claim, the result reached is frequently a more equitable adjustment than is possible to be had in a court of law."

20

*Deere*, 224 Mont. at 394, 730 P.2d at 403 (citation omitted). *See also DeTienne Assocs. Ltd. Partnership v. Mont. Rail Link* (1994), 264 Mont. 16, 22, 869 P.2d 258, 262.

¶49     Ostensibly, evidence of the Tripps' settlement with Howard was admitted under the exception of Rule 408, M.R.Evid., to demonstrate bias on the part of Howard. However, the use of this evidence at trial did not serve the purpose for which it was allowed because it did not, in any logical way, tend to establish bias on the part of Howard. Rather, this evidence effectively imputed liability to Howard--precisely the result Rule 408, M.R.Evid., was designed to prevent.

¶50     The basic policy of Rule 408, M.R.Evid., is "to encourage compromises and settlement of disputes." *Tribby v. Northwestern Bank of Great Falls* (1985), 217 Mont. 196, 210, 704 P.2d 409, 418. This policy is clearly violated when, as here, evidence of settlement is admitted based on pure speculation.

¶51     In order to place Jeld-Wen's arguments and our Opinion in context, I will briefly review the pertinent facts, some of which are not included in the Court's Opinion. In 1995, the Tripps contracted with Howard to construct their new home. Pursuant to this agreement, the COMPLY floor product was installed in the Tripps' home. After the "squeaking" problems surfaced, the Tripps asked Howard to estimate the cost to fix the problem. In August of 1996, Howard provided an estimate of $30,829 for the repairs. In April of 1997, the Tripps brought their suit against Jeld-Wen. Jeld-Wen filed a third-party complaint against Howard, alleging that the Tripps' damages were caused by improper installation, and requesting indemnity and contribution. Howard then filed a cross-claim against Jeld-Wen

21

for indemnity and contribution. Subsequently, Howard's insurance carrier settled with the Tripps for $20,000 and the District Court dismissed Howard from the lawsuit. Then, in September of 2002, when the floor problem had grown worse, Howard provided a second estimate of $98,000 for repairing the floor.

¶52 After the Tripps had settled with Howard, they moved to exclude evidence of the settlement pursuant to Rule 408, M.R.Evid., which provides in pertinent part:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. . . . This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness . . . .

In its Order and Memorandum of January 26, 2001, the District Court correctly ruled that evidence of the settlement was inadmissible at trial, noting that Jeld-Wen had not proposed admission of such evidence under any of the exceptions of Rule 408, M.R.Evid. At trial, however, Jeld-Wen contended that evidence of the settlement should be admissible to demonstrate bias on the part of Howard. The District Court then reversed itself and admitted, over objection, the evidence for that purpose.

¶53 The problem with the District Court's decision is that Jeld-Wen offered no logical reason to support its contention that this evidence could show a bias on the part of Howard. In arguing for admission of the settlement, Jeld-Wen's counsel conjectured "[t]here could very well be some other agreements that we have not been privy to about why [Howard's]

22

cost to prepare [sic] has jumped some three hundred percent . . . ." Jeld-Wen's counsel also opined "I think the jury could reasonably conclude that there was - especially - that there was some sort of a - a bias that exists with Mr. Howard, given the amount of his settlement, twenty thousand dollars, when compared to the amount of money that the Plaintiffs are now seeking." The District Court accepted these speculations as the basis for admitting evidence of the settlement, stating "[w]ell, I know that settlement is generally precluded, but counsel makes the point - and I think it's a good one - that something smells here."

¶54    It appears Jeld-Wen's counsel was speculating that Howard stood to gain something from improperly increasing his second repair estimate, or that Howard had some other conflict of interest with respect to Jeld-Wen. Had there been evidence to back up its conjectures, Jeld-Wen would have been within its rights to seek admission of the settlement. The problem is Jeld-Wen utterly failed to offer any such evidence to back up either its rank speculation or its conclusion that "the settlement agreement . . . clearly explains the distinction" between the two estimates. If Jeld-Wen believed that Howard was biased because of his settlement with the Tripps, then it could have, and should have, developed that theory through discovery. Jeld-Wen did not.

¶55    Rule 408, M.R.Evid., precludes the use of settlements to prove liability. While, as noted, evidence of Howard's settlement was ostensibly used to show bias, it was effectively used to impute liability to Howard. This is clearly demonstrated by Jeld-Wen's repeated use of questions such as: "You settled a claim against you with the Tripps related to *this exact issue*, didn't you?" and "You or someone on your behalf paid to the Tripps twenty thousand

23

dollars to settle *the issues raised in this lawsuit*; yes or no?" Indeed, Jeld-Wen's counsel's closing argument was almost entirely devoted to placing liability for the failure of the COMPLY product on Howard.

¶56 The Tripps argue that these questions effectively attributed liability to Howard. However, our Opinion does not address that argument. Rather, this Court simply accepts Jeld-Wen's assertion that these questions were not used to prove any issue of liability. Hence, with no analysis, our Opinion concludes that this evidence was permissible under Rule 408, M.R.Evid. This is a truly unfortunate precedent to impose on our future jurisprudence.

¶57 Additionally, even if, arguendo, evidence of the settlement was properly admitted, the District Court's ruling allowing evidence of the *amount* of the settlement was clear reversible error. In *Azure v. City of Billings* (1979), 182 Mont. 234, 596 P.2d 460, we discussed the type of prejudice that results from placing the amount of a settlement before the jury. Among other things, we stated that allowing evidence of a settlement involving one of the parties poses a danger that "the jury will be adversely influenced by extraneous factors which will creep into the jury's decision-making process," and that "if a settlement is disclosed to the jury, there is a danger that the jury may consider the settlement as evidence of total responsibility for the injury and the defendant's freedom from fault." *Azure*, 182 Mont. at 245, 596 P.2d at 466-67. We also cited with approval language from *Degen v. Bayman* (S.D. 1972), 200 N.W.2d 134, 139, that the court could "visualize no circumstances where the amount involved in a release or covenant need be disclosed to the jury."

24

¶58    In addressing the Tripps' argument that admission of the amount of the settlement was improper, our Opinion adopts Jeld-Wen's rationale, stating at ¶ 21:

> The amount Howard settled for was very similar to the amount that Howard's owner earlier had contended it would have cost to repair the floor. Because he settled at that amount, Jeld-Wen could argue that he was inconsistent when he testified to a different, much greater, repair figure. Therefore, inquiry into the amount was pertinent to the credibility of the witness . . . .

The Court determines that $20,000 and $30,829 are "very similar" in this case, and apparently finds some significance in the fact that Howard settled for an amount that was approximately two-thirds of his original repair estimate. What this significance may be, we are not told. As far as I can see, this fact carries no significance at all in the resolution of this issue. Furthermore, it is not clear why the Court thinks such a fact justifies the conclusion that Jeld-Wen could argue Howard was inconsistent in providing two differing repair estimates. The reality of the matter is that Jeld-Wen was entitled to make that argument regardless of the settlement amount, and even if no settlement had occurred, because that argument was justified by the mere fact that the two estimates were significantly different.

¶59    Even if, as we hold, evidence of Howard's settlement was permissible to demonstrate bias and prejudice, nonetheless the testimony should have been limited to the mere existence of the agreement and the fact that Howard might have received some benefit from the agreement. Allowing evidence of the amount of the agreement was reversible error.

¶60    Jeld-Wen utterly failed to demonstrate that evidence of the settlement would show bias on the part of Howard. Furthermore, substantial injustice resulted because the admission of the settlement imputed liability to Howard--precisely what Rule 408,

25

M.R.Evid., was designed to prevent. Moreover, admission of the amount of the settlement was clear reversible error under our case law. I would hold that the District Court committed reversible error when it allowed evidence of Howard's settlement agreement with the Tripps, and, in particular, evidence of the amount of the settlement. I would, accordingly, reverse and remand for a new trial on Issue Two.

¶61 Finally, I disagree with our conclusion under Issue Four, that the District Court did not err in giving Jeld-Wen's proposed jury instruction regarding negligent misrepresentation. The Tripps' complaint asserted claims for negligence, breach of warranty, and deceptive trade practice. No claim was made for negligent misrepresentation, and evidence of negligent misrepresentation was not introduced at trial.

¶62 We apparently determine that there is some significance in the fact that Instruction 19 (the negligent misrepresentation instruction) was grouped with Instructions 17-20, and that Instructions 17, 18 and 20 only speak of negligence and not negligent misrepresentation. This conclusion begs the question: "So what?" The District Court read Instruction 19 to the jury and presumably the jury studied and followed the Instruction during its deliberations. The fact that the improper instruction was buried in with other proper instructions does not mitigate the error in giving it.

¶63 Instruction 19 states that "[p]laintiffs claim negligent misrepresentation." That is patently untrue. The Tripps did not claim negligent misrepresentation in their complaint or at trial. Indeed, that fact was reflected in the verdict form, which included only the three

claims made by the Tripps, namely: (1) negligence; (2) breach of warranty; and (3) deceptive trade practice.

¶64 Instruction 16 stated: "The following principles of law apply to the Plaintiffs' negligence claim." Instruction 17 stated:

> Every person is responsible for injury to the person or property of another, caused by his or her negligence.
> Negligence is the failure to use reasonable care. Negligence may consist of action or inaction. A person is negligent if he fails to act as an ordinarily prudent person would act under the circumstances.

¶65 Instruction 18 stated:

> The Defendant is liable if his negligence was the cause of Plaintiffs' damages. The Defendant's conduct is the cause of the damage if it produced it and if the damages would not have occurred without it.

¶66 According to Instruction 19, in order to establish a claim of negligent misrepresentation the Plaintiffs had to prove that: (1) the Defendant made a representation as to a material fact; (2) the representation was untrue; (3) regardless of his actual belief, the Defendant made the representation without any reasonable ground for believing it to be true; (4) the representation was made with the intent to induce Plaintiffs to rely upon it; (5) Plaintiffs were unaware of the falsity of the representation and were justified in relying on it; and (6) as a result of the reliance, Plaintiffs sustained damage.

¶67 Instruction 19 directly preceded the final negligence instruction--Instruction 20-- which told the jury that the Plaintiffs had the burden of proving that: (1) the Defendant was negligent; (2) the Plaintiffs' property was damaged; (3) the Defendant's negligence was a

27

cause of the injury to the Plaintiffs' property; and (4) the amount of money that will compensate the Plaintiffs for the damage to Plaintiffs' property.

¶68     These instructions, in isolation, may correctly state the law of negligence and of negligent misrepresentation. Taken together, however, and based on the record of this case, Instruction 19 hopelessly confused the jury by indicating that somehow negligent misrepresentation was a part of the negligence claim--which, of course, it was not. Instruction 19 placed before the jury an issue that was never pled or presented throughout the course of the trial. The fact that the Tripps claimed that misrepresentations led them to use the COMPLY product does not mean that their negligence claim "could also be characterized as a negligent misrepresentation claim," as our Opinion concludes.

¶69     Moreover, as noted above, the jury had no way to render a verdict on the tort of negligent misrepresentation, which was not raised, separate from the negligence claim which was raised. From the verdict form and from the jury's perspective, negligent misrepresentation and negligence were combined into one tort. Indeed, the jury's confusion was manifest. From post-trial polling, according to the Tripps, a majority of the jurors stated that they could not find liability against Jeld-Wen on negligent misrepresentation since Jeld-Wen had not made any representations to the Tripps with the intent of inducing reliance in deciding to use the COMPLY product.

¶70     Tripps' counsel did make arguments in closing with respect to negligent misrepresentation but obviously he had to do so, since the trial court improperly injected that theory into the case via Instruction 19.

¶71 I would hold that the District Court abused its discretion and erred in giving Instruction 19. I would reverse and remand as to Issue Four.

¶72 In summary, I would hold that the District Court erred as to Issues One, Two and Four and would remand for new trial. That being the case, I would not reach Issues Three or Five.

¶73 I dissent.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter dissenting and concurring.

¶74 I join Justice Nelson's dissent. However, in light of the fact that the Court is affirming the judgment for the defendant, the Court must reach the question of whether the District Court erred in its award of attorney fees to the defendant under the MCPA. While I would not award fees at all to the defendant, I concur with the Court's analysis of how fees to a prevailing defendant in an MCPA action ought to be analyzed. I therefore join the Court's Opinion as to Issue Five only.

/S/ PATRICIA O. COTTER

30

Justice Jim Rice concurring in part and dissenting in part.

¶75    I concur in the Court's holding on Issues One through Four. I dissent from Issue Five.

¶76    Drawing on its assessment that the Consumer Protection Act constitutes a "high legislative priority" with the purpose, unstated anywhere in the statute itself, of "protecting the monetary interests of plaintiffs, and not defendants," the Court today re-writes the attorney fee provision of the Act to fit its own policy preferences. Although not adopting the Tripps' argument that prevailing defendants be awarded attorney fees only when a plaintiff has acted in "bad faith," it nonetheless concludes that "we should adopt an intermediate standard between 'bad faith' and 'prevailing party.'" The Court's profound error is this: it is allowed no such choice. The Legislature has already adopted "prevailing party" as the standard–not "bad faith," "frivolous," "unreasonable" or "without foundation"–and this Court is constitutionally powerless to change it–except by taking to itself power it has not been granted.

¶77    The result of this decision, unstated by the Court, is that fewer prevailing defendants will be eligible for an award of attorney fees, and fewer losing plaintiffs will be subjected to payment of a fee award, than intended by the Legislature. Unquestionably then, the Court's new "standard" takes away from the discretion which the Legislature granted to the district courts for resolution of attorney fee issues under the Act. The Court has thus engaged in an extra-judicial act which usurps legislative authority.

31

¶78    The federal and state judiciary in our country is today bringing much attention to a principle it holds dear: judicial independence. Criticisms of judicial decisions or legislative proposals which would affect the judicial organization are denounced by the judiciary and its affiliated organizations, such as the various Bars, as an infringement upon judicial independence, as if the judiciary is immune from criticism, or that changes in the judicial structure are barred by the separation of powers. Many would acknowledge that much of this is political rhetoric,[3] and yet, there is a central premise to judicial independence that must rightly be preserved. Defenders of judicial independence often fail to understand, however, that the judiciary can best protect its independence by being careful not to infringe on the independence of the legislative and executive branches:

> The power of the Supreme Court to command acceptance and support not only for its decisions but also for its role in government seems to depend upon a sufficiently widespread conviction that it is acting legitimately, that is, performing the functions assigned to it, and only those functions, in the manner assigned.

ARCHIBALD COX, THE ROLE OF THE SUPREME COURT IN AMERICAN GOVERNMENT (Oxford University Press 1976), 104-05.

¶79    The Court today steps outside of its legitimate role and steps into the legislative arena. It thereby invites the other branches to act similarly. It should not act surprised when that occurs.

---

[3]*See* Stephen B. Burbank, *What Do We Mean by "Judicial Independence"?*, 64 Ohio St. LJ. 323 (2003).

¶80    I would affirm the District Court on Issue 5.


/S/ JIM RICE


Chief Justice Karla M. Gray joins the concurring and dissenting opinion of Justice Rice.


/S/ KARLA M. GRAY


Justice John Warner concurs.

¶80    I agree with the principles in Justice Rice's dissent on issue five. I would sign that dissent if I was of the opinion that such principles applied. However, as provided in § 30-14-133(3), MCA, and noted by the Court at ¶ 32, the legislature has made an award of attorney fees to either a prevailing plaintiff or defendant discretionary, not mandatory. We here set a standard for the exercise of that discretion. We show no disrespect to, nor do we infringe on, the legislature's prerogative by setting such standard.


/S/ JOHN WARNER