DA 14-0075

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 246

FILED

August 18 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0075

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

CHARLES BOMAN BOWEN,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fifteenth Judicial District,
In and For the County of Roosevelt, Cause No. DC-2012-4
Honorable David Cybulski, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Robin A. Meguire, Attorney at Law, Great Falls, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant
          Attorney General, Helena, Montana

          Daniel Guzynski, Mary E. Cochenour, Assistant Attorneys General, Special
          Deputy Roosevelt County Attorneys, Helena, Montana

                         Submitted on Briefs:  July 15, 2015
                                  Decided:  August 18, 2015

Filed:

                                     Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1      Charles Boman Bowen (Bowen) appeals his conviction for the offense of negligent homicide following a jury trial in the Fifteenth Judicial District Court, Roosevelt County. We affirm.

¶2      We consider the following issues on appeal:

1.      *Whether the District Court abused its discretion in permitting Dianna Nelson (Nelson) to testify as a witness at trial.*

2.      *Whether the District Court erred in denying Bowen's motion to dismiss for insufficient evidence.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3      On January 20, 2012, the body of Brian Doyle (Doyle) was found in a ditch along Highway 2 between Bainville and Culbertson, Montana. Montana Department of Transportation (MDOT) employees were picking up debris along Highway 2 when they discovered a snow-covered body laying face down in the ditch on the north side of the highway. The MDOT employees called 911 and waited for law enforcement to arrive.

¶4      The Montana Department of Justice, Division of Criminal Investigation (DCI) and the Roosevelt County Sheriff's Office (RCSO) arrived and investigated the area where Doyle was found. Law enforcement observed snow covered tire tracks on the shoulder of the road near Doyle's body, which appeared to indicate Doyle had been struck or run over by a vehicle. They recovered Doyle's right boot 13.5 feet west of his body, Doyle's left boot 31 feet east of his body, and Doyle's cell phone 100 feet uphill of his body. Two empty beer cans were located east and a good distance away from the body and an unopened beer can with blood on it, later determined to be Bowen's blood, were found closer to Doyle's body.

2

A mobile GPS unit and power cord, later determined to be registered to an address where Bowen's mother resided was located east of the body. A credit card receipt dated January 11, 2012, for 9:01 p.m., from Hardees' drive thru in Williston, North Dakota, was found 15 feet from Doyle. It was later determined that Bowen's credit card was used for the Hardee's purchase. These items appeared in a linear pattern north of the snow covered tracks leading to the ditch near Doyle's body.

¶5 Doyle's death was eventually determined to have occurred the night of January 11, 2012. That night the temperature in the area, considering wind-chill, was between -4 and -7 degrees. Doyle was clothed in a short-sleeve t-shirt, sleeveless undershirt, pajama pants underneath his jeans, and socks. Doyle was identified by a wallet inside his pants pocket which contained a Florida Identification Card with Doyle's name and a paystub. Doyle also had $1,750 in cash.

¶6 On January 24, 2012, Agent Dahl of DCI (Dahl) reviewed the Hardee's surveillance video and observed a four-door, white Dodge Dakota pickup truck proceeding through the drive thru at 9 p.m. Additionally, DCI learned that Doyle may have had an altercation at a Williston restaurant, the El Rancho, the evening of January 9 or 10, 2012. Dahl subsequently viewed, on January 26, the surveillance video for the night of January 11, after learning that the 11th was the evening that Bowen and Doyle were at El Rancho. The video showed Bowen arriving at the El Rancho parking lot at 7:12 p.m. Doyle, arriving soon after, socialized with Bowen for about an hour and a half and left with Bowen in Bowen's truck at 8:50 p.m. Doyle was carrying a heavy coat and long-sleeve shirt when he got into Bowen's truck. There did not appear to be any altercations between Bowen and Doyle.

3

¶7     DCI also learned that Doyle worked in the North Dakota oil fields and identified several of Doyle's co-workers to interview. After obtaining his number from a witness, Dahl contacted Bowen by phone on January 25, 2012, and attempted to set up an interview. Bowen did not answer and Dahl, not knowing if he had the correct number for Bowen, did not leave a message. Bowen called Dahl back that evening. Bowen told Dahl that he met Doyle on the evening of January 11 at the El Rancho, where they shared some beers and ordered food. But the food was taking too long and they left when Doyle, who was intoxicated, became agitated. Bowen explained to Dahl that after leaving El Rancho, Doyle began hitting him, as he was driving, and he had to stop and ask Doyle to get out. Bowen said he stopped and left Doyle somewhere near Hardees. Dahl asked if Bowen would be willing to set up a time for an interview. Bowen agreed to meet Dahl the following day, January 26, at Bowen's work location.

¶8     On January 26, during a recorded interview, Bowen again told Dahl that he had left Doyle near Hardees on the night of January 11. Bowen claimed he ate at home that night. Bowen said Doyle became combative, hitting Bowen in the face and grabbing him by the hair. After Doyle got out of the truck, Bowen proceeded home, where he ate and went to bed. Bowen gave a similar version of events to Erin Groom, Doyle's sister, when Bowen called the Doyle family on January 23, 2012. Bowen also described his truck to Dahl. Following the interview, Dahl observed Bowen was driving a white Dodge Dakota truck and confirmed this was the same truck seen in the Hardees drive thru surveillance video.

¶9     During the evening of January 26, Bowen again contacted Dahl and told Dahl that he had a phone call with Doyle on January 11. Dahl asked if Bowen would agree to meet again

4

to document this phone information. Bowen agreed to meet Dahl the following day, January 27, at his workplace.

¶10    By now, Bowen had become a person of interest, if not a suspect, and was Mirandized at the outset of the January 27 interview. Bowen began by telling Dahl, consistent with his first interview, that he had left Doyle near Hardees and had not eaten at Hardees. Dahl advised Bowen that law enforcement had found a Hardees' receipt near Doyle's body. Dahl then matched the numbers on the receipt to Bowen's credit card. When presented with this credit card information and further information implicating him in Doyle's death, Bowen started to sob and began to relate a different version of events.

¶11    Bowen stated that he did not drop Doyle off near Hardees on January 11, but agreed to drive Doyle home to Culbertson. Along the way, Bowen and Doyle began arguing and Doyle started hitting Bowen, pulling his hair, and biting Bowen's nose as they were driving on the highway outside of Williston. Bowen began slowing the truck down from highway speed as Doyle continued to attack him. According to Bowen, just as he was coming to a stop, Doyle got out of the truck and told Bowen to leave. At this point, they were moving slowly along the shoulder about 20 minutes outside of Williston. According to Bowen, Doyle continued to yell and scream outside of the truck, telling Bowen to go away. Bowen explained to Dahl that, at that point, he drove away.

¶12    During the interview, Bowen maintained that Doyle had his coat and that he had not thrown any items from the truck. Bowen said that when he last saw Doyle, Doyle was standing behind the truck. Bowen stated he drove away and then turned his truck around so that he could try to find Doyle, but could not find him because it was "pitch dark." Bowen

5

maintained that "I did not hit my friend. That, no way; that did not happen." Bowen admitted that since January 11 he had washed his truck, but made no mention to Dahl of having changed his tires on January 26, 2012.

¶13     DCI learned that Bowen purchased four new tires for his truck from Wal-Mart on January 25, 2012. Although it would only have cost an additional $6.00 to dispose of the old tires, Bowen took the tires with him. The tire technician recalled that Bowen's truck was unusually clean for that time of year. On February 1, 2012, after obtaining a warrant, DCI searched Bowen's truck. They discovered hairs, subsequently identified as Bowen's, on the floor of the truck. DCI also found a carwash receipt for January 25, 2012, that included washing the undercarriage of Bowen's truck.

¶14     Mike Kerley (Kerley), Bowen's roommate, was interviewed by DCI and related that on the morning of January 11 Bowen had a mark on his nose. When Kerley asked Bowen about it, Bowen said that Doyle had bit him, and that he had left Doyle in the El Rancho parking lot. Later however, Bowen told Kerley that he had left Doyle in a residential area.

¶15     Dr. Bennett, the forensic pathologist who performed the autopsy on Doyle, opined that Doyle would have most likely been laying down when a vehicle, traveling at approximately 5 mph, ran over him. This conclusion was based, in part, on the fact that there was no evidence that Doyle had walked in his socks. Doyle sustained multiple rib fractures, a collapsed lung, a torn liver, internal bleeding, and multiple skin abrasions. Due to the injuries on Doyle's right side, his entire right arm would have been rendered non-functional. Dr. Bennett discovered a stocking hat, work gloves, and a lighter inside Doyle's jean pocket. Dr. Bennett believed that Doyle's injuries were very painful and it was possible

6

that Doyle could have passed out, at some point, from that amount of pain. Dr. Bennett believed it would have been very painful to breathe or move with these types of injuries. It was Dr. Bennett's opinion, however, that the injuries were not life threatening unless they were left untreated. Dr. Bennett indicated that Doyle's death was not instantaneous, and it would have taken three hours for Doyle to succumb to hypothermia. Dr. Bennett opinioned that had Doyle been stabilized in a warm place, his injuries would not have been life threatening and Doyle would not have died of hypothermia. The toxicology report showed that Doyle had a blood alcohol content of 0.11% and a urine alcohol content of 0.07%.

¶16    Bowen was charged on February 21, 2012, with negligent homicide, a felony, in violation of § 45-4-104, MCA. On March 18, 2012, Kerley told DCI that a friend of Bowen's, a woman named "Dianna," had recently called him and related that she and Bowen had a conversation around the time of Doyle's death and that Bowen talked about leaving Doyle on the road. Dianna told Kerley "I told Bo[wen] to go back. I told him he should go back." Bowen's counsel was made aware of Kerley's statement by May 2012 and was provided a transcript of Kerley's interview. The State attempted to contact and locate Dianna, later identified as Dianna Nelson (Nelson), but had difficulty identifying her because she was not listed as a subscriber to the cell phone she called Kerley on. Eventually DCI confirmed Nelson's location in Louisiana. Nelson was interviewed by DCI on April 10, 2013 and Bowen's counsel was provided notice the following day of the State's intent to call her as a witness. On April 22, 2013, the State filed a motion to certify Nelson as a material witness, which was granted by the court. A transcript of Nelson's April 10, 2013 interview with DCI was provided to Bowen's counsel on April 24, 2013.

7

¶17    During trial testimony, Nelson explained that Bowen called her after leaving Doyle. Bowen said he and Doyle had an altercation that led Bowen to pull over to the side of the road. Bowen told Nelson that both men continued the altercation outside of the truck and that eventually Doyle fell down beside the truck, at which point Bowen got back in his truck and drove away. Bowen told Nelson that he was not sure if he had run over Doyle and that he still had Doyle's coat in his truck. Nelson then told Bowen, "you have to go back. You gotta go back and check on him and make sure." To which Bowen replied that he was scared. Bowen asked Nelson not to discuss the conversation with anyone and not to call or text him. Undisputed cell phone records established that on January 11, 2012, Bowen called Nelson at 10:37 p.m. and the call lasted 30 minutes.

¶18    Bowen filed a Motion to Exclude the Testimony of Nelson on May 15, 2013, arguing that exclusion was justified based upon the State's late disclosure and untimely notice of Nelson as a material witness. The State responded that the defense had knowledge of Nelson since March 2012—nearly the entire period of time since the filing of the information. The State represented it had diligently tried to locate Nelson and found her two months prior to trial. The State maintained that the defense had the option of continuing the trial so that he could conduct further discovery regarding Nelson's anticipated testimony. The court heard argument on the motion during a scheduling conference on May 29, 2013, and denied the motion to exclude, reasoning that Nelson was likely more familiar to the defense than the State.

¶19    Bowen's jury trial began on June 3, 2012, and lasted four days. At the conclusion of the State's case, Bowen moved to dismiss the charges based upon insufficiency of the

evidence. Bowen's motion was denied and the jury convicted him of negligent homicide. The District Court sentenced Bowen to twenty years in the Montana State Prison.

## STANDARD OF REVIEW

¶20 A district court's ruling to allow testimony of a witness is reviewed for abuse of discretion. *State v. Normandy*, 2008 MT 437, ¶ 12, 347 Mont. 505, 198 P.3d 834 (citing *State v. Bailey*, 2004 MT 87, ¶ 11, 320 Mont. 501, 87 P.3d 1032). "An abuse of discretion occurs when a court acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *State v. Ziolkowski*, 2014 MT 58, ¶ 11, 374 Mont. 162, 321 P.3d 816 (citing *State v. Belanus*, 2010 MT 204, ¶ 15, 357 Mont. 463, 240 P.3d 1021).

¶21 This court reviews de novo a district court's denial of defendant's motion to dismiss for insufficient evidence. *State v. Eisenzimer*, 2014 MT 208, ¶ 5, 376 Mont. 157, 330 P.3d 116 (citing *State v. Kirn*, 2012 MT 69, ¶ 8, 364 Mont. 356, 274 P.3d 746).

## DISCUSSION

¶22 1. *Whether the District court abused its discretion in permitting Nelson to testify as a witness at trial.*

¶23 Montana's discovery scheme is designed to enhance the search for truth and to avoid unnecessary delay and surprise at trial. *State v. Walters*, 228 Mont. 490, 495, 743 P.2d 617, 620 (1987). The goal is accomplished by providing full notification of each side's case-in-chief in order to avoid unnecessary delay and surprise at trial. *Walters*, 228 Mont. at 495, 743 P.2d at 620. Bowen maintains the untimely notice by the State of its intention to use Nelson as a material witness warranted the exclusion of her testimony and that the

9

District Court abused its discretion when it denied Bowen's motion to exclude. The State argues as Bowen himself made the incriminating statements, he cannot claim surprise regarding the substance of Nelson's testimony. Further, the State argues Bowen's counsel was made aware in May 2012 of Kerley's statements concerning Nelson and the incriminating nature of her testimony.

¶24 Here, the efforts made by the State to locate "Dianna" were exemplary and thorough. In all respects, the State complied with its discovery obligations. The State's efforts at locating "Dianna" were aptly summarized by DCI Agent Len Knutson's testimony at trial.

> Initially what we did is we obtained a court order to contact Verizon wireless's cell phone provider to see if we could get subscriber information, which would include address on the person that had that telephone. But we learned through Verizon wireless that the telephone was a prepay phone and they didn't hold subscriber information. We ended up following through with that by having Agent Gary Seder, who works in the Internet Crimes against Children task force in Billings--he has access to and knowledge of experiencing how to search various search engines that I don't have access to in trying to find somebody. I had him go through and try to see if he could find somebody with that telephone number. As he did, he came up with an advertisement out of New Orleans on a car dealership where a man by the name of Carl Keith was using that telephone number as a cell phone for himself. So we then began the process of trying to locate Mr. Keith. We eventually found Mr. Keith by contacting the car dealership itself. They said he was no longer employed there, he was now employed in Texas. I ended up calling--they didn't know where, they just knew it was a Lexus dealership. So I started calling Lexus dealerships in Texas in the Dallas area. I ended up speaking to Mr. Keith, and he told me that he had discontinued the service on that telephone in November of 2011 when he left Louisiana for Texas. We ended up continuing searching throughout the period of this time and having difficulty. There came a point in time when Mr. Doyle's family made contact with us and advised us that Thomas Doyle, the victim's brother, was in Jensen Beach, Florida, and learned from another individual that Dianna had made a statement quite similar stating that this was an accident and that –
>
>     .   .   .
>
> A telephone number was provided again for Dianna. It was this same telephone number. Now, having the name of a person who might be

10

associated with Dianna, we had Agent Seder go back and start checking through Facebook, through various messaging accounts, and trying to locate and identify who that might be. There came a point in time when that individual was identified. We had law enforcement officers in Florida make contact with him and interview him. During that, another person's name came up. That person was also interviewed by out of state sources in Florida. Through those, we ended up with knowledge that Dianna had moved back in with her husband and was now living--initially we were told in Baton Rouge, Louisiana area. So I contacted Louisiana authorities and had them try to find Dianna Nelson. I dealt with Louisiana state police, I dealt with Departments of Corrections, I dealt with other jurisdictions. It turned out that the Louisiana state police was able to find where she had opened an account for utilities, she or her husband, who had just opened an account, I believe, it was in January of 2013. And so based on that, I asked the trooper that was helping us, Trooper Joe Patout, P-a-t-o-ut, with the Louisiana state police, if he could make a cold contact on Dianna Nelson and make an identification from her Florida ID without her knowing that it had anything to do with Montana authorities or a death investigation here.

¶25 The Defense ignores a number of considerations when it argues that the State's late disclosure "did not give Bowen adequate time to prepare for, and defend against, her damaging testimony at trial." First, through the statements of Kerley, the defense was aware of Nelson early on in the investigation, and would have had a general understanding regarding Nelson's expected testimony. Second, the record clearly establishes that the State's efforts to identify, locate, and interview Nelson were significant and ongoing, and would have put Bowen on notice that the State expected to call Nelson at trial. Third, the State notified Bowen immediately upon locating Nelson, and made her interview available to Bowen six weeks before trial. Fourth, the Defense interviewed Nelson five days before the pre-trial hearing and ten days before Nelson testified. Finally, the Defense did not ask for a continuance to further "prepare against such a damaging witness," but instead chose to proceed to trial.

11

¶26    We held in *State v. Grindheim*, 2004 MT 311, 323 Mont. 519, 101 P.3d 267, that the district court did not abuse its discretion when it denied a motion to exclude a witness's testimony where the defense had been made aware of the witness's statements four months prior to trial, even though the witness had been added by the State just five days before trial. *Grindheim*, ¶ 27. We concluded that both the content of the testimony and the witness herself were not a surprise to the defendant. *Grindheim*, ¶ 34. In Bowen's case, as in *Grindheim*, we find it significant that, in addition to the diligent efforts made by the State to locate Nelson, Bowen clearly knew who Nelson was and the substance of the statements he made to her. Further, Bowen knew early on in the State's investigation that the State was trying to locate Nelson as a potential witness for its case.

¶27    In *State v. Giddings*, 2009 MT 61, 349 Mont. 347, ¶¶ 65-74, 208 P.3d 363, we affirmed a trial court's decision to allow, 30 days before trial, two additional witnesses. We noted in *Giddings* that the defense knew the witnesses were potential witnesses, that Giddings had been made aware of the nature of the witnesses' statements in police reports over a year before trial, and Giddings had at least a month to prepare cross examination of at least one of the witnesses following the State's filing of notice. *Giddings*, ¶¶ 71, 72.

¶28    Here, as in *Giddings* and *Grindheim*, the Defense cannot claim that Nelson or her testimony was a surprise. Bowen's counsel was aware of the State's on-going efforts to locate Nelson since early in the investigation. The State filed its notice nearly two months before trial and Bowen had the opportunity to interview Nelson prior to trial. The State's efforts to locate Nelson were extensive and diligent. The record establishes that the District

12

Court did not act arbitrarily and did not abuse its discretion in denying Bowen's motion to exclude Nelson's testimony.

¶29    2. *Whether the District Court erred in denying Bowen's motion to dismiss for insufficient evidence.*

¶30    When considering the denial of a motion to dismiss for insufficient evidence, this Court will assume every fact the jury could have deduced from the evidence and will not substitute our own judgment for that of the jury. *State v. Jackson*, 2009 MT 427, ¶ 23, 354 Mont. 63, 221 P.3d 1213 (citing *State v. Merseal*, 167 Mont. 412, 415, 538 P.2d 1366, 1367 (1975); *State v. Azure*, 2002 MT 22, ¶ 49, 308 Mont. 201, 41 P.3d 899). We have repeatedly held that a conviction may be based entirely on circumstantial evidence. *Jackson*, ¶ 28. *See also State v. Hill*, 2008 MT 260, ¶ 35, 345 Mont. 95, 189 P.3d 1201; *State v. Field*, 2005 MT 181, ¶ 18, 328 Mont. 26, 116 P.3d 813; and *State v. Merrick*, 2000 MT 124, ¶ 13, 299 Mont. 472, 2 P.3d 242. "When circumstantial evidence is susceptible of two interpretations, one which supports guilt and the other which supports innocence, the trier of fact determines which is the most reasonable." *State v. Bowman*, 2004 MT 119, ¶ 53, 321 Mont. 176, 89 P.3d 986 (citing *State v. Hall*, 1999 MT 297 ¶2 2, 297 Mont. 111, 991 P.2d 922). Additionally, conflicting testimony does not render the evidence insufficient to support a conviction. *State v. Wood*, 2008 MT 298, ¶ 43, 345 Mont. 487, 191 P.3d 463. The testimony from any one witness, that the jury believes, is sufficient to prove any fact in a case. *State v. Erickson*, 2014 MT 304, ¶¶ 29-31, 377 Mont. 84, 338 P.3d 598.

¶31   Bowen was charged with negligent homicide in violation of §§ 45-5-104(1) and 45-2-202, MCA.  To find Bowen guilty, there must have been sufficient evidence to support findings for each of the following elements:

1.    That on or about January 11, 2012, within Roosevelt County;
2.    Bowen caused injury to Doyle with a vehicle;
3.    This injury placed Doyle in peril;
4.    Bowne did not assist or render aid to Doyle;
5.    Bowen's failure to assist or render aid to Doyle was negligent;
6.    Bowen's failure to assist or summon aid to Doyle was the cause of Doyle's death.

Bowen argues that the State failed to present sufficient evidence to prove Bowen's vehicle caused the peril to Doyle.  Bowen also argues his failure to render aid was not the cause-in-fact of Doyle's death.

¶32   To begin, there was direct, physical evidence that Bowen was at the scene of Doyle's death.  Bowen's GPS and a Hardee's receipt with Bowen's credit card number were located next to Doyle's body.  There was also a beer can with Bowen's blood on it.  Bowen admitted to having dropped Doyle off along the road at a slow speed, which was consistent with Dr. Bennett's testimony that Doyle was struck by a slow moving vehicle.  In addition to this direct evidence there was circumstantial evidence that Bowen had cleaned his vehicle and purchased four new tires following Doyle's death, before responding to inquiries from DCI.  Bowen gave inconsistent stories to investigators and friends in order to avoid being placed at the scene.  Finally, Nelson's testimony corroborated that Bowen drove Doyle on the highway, stopped his vehicle and as he pulled out, Bowen ran over Doyle.  These facts, presented during the State's case-in-chief, were sufficient for a reasonable jury to conclude that Bowen's vehicle caused Doyle's injuries and, therefore, created the peril.

14

¶33 Bowen also argues that while there was evidence placing Bowen at the scene of the crime and expert testimony that Doyle's injuries were consistent with being ran over by a vehicle, there was no evidence establishing that Bowen's specific vehicle run over Doyle and/or placed Doyle in any peril, i.e. that Bowen was the cause-in-fact of Doyle's death. "When a person places another in a position of danger, and then fails to safeguard or rescue that person, and the person subsequently dies as a result of this omission, such an omission may be sufficient to support criminal liability." *State ex rel. Kuntz v. Mont. Thirteenth Judicial Dist. Court*, 2000 MT 22, ¶ 20, 298 Mont. 146, 995 P.2d 951 (citation omitted). Cause-in-fact is required for a conviction of negligent homicide. *See State v. Schipman*, 2000 MT 102, 299 Mont. 273, 2 P.3d 223. Generally, where a crime is based on some form of negligence the State must show that defendant's negligent conduct was the cause-in-fact of the victim's death. *State v. Bier*, 181 Mont. 27, 32, 591 P.2d 1115, 1118 (1979). Proximate cause is proven by establishing cause-in-fact, also known as the but for test or substantial factor test. *Estate of Strever v. Cline*, 278 Mont. 165, 175, 924 P.2d 666, 672 (1996). A party's conduct is a cause-in-fact of an event if the event would not have occurred but for that conduct. *Kuntz*, ¶ 37. Further, the defendant's conduct is not a cause of the event, if the event would have occurred without the conduct. *Kuntz*, ¶ 37.

¶34 The record establishes, as discussed previously, sufficient evidence that Bowen caused Doyle's injuries and that the injuries left Doyle immobile and unable to seek assistance. Bowen thus created the peril that resulted in Doyle's death by leaving him, immobile and severely injured, along the highway in sub-zero temperatures without his coat and after running over him. It was Bowen's failure to render and seek aid, having created the

15

peril, which caused Doyle's death. Viewing the testimony and evidence in a light most favorable to the prosecution, we are convinced that there was sufficient evidence upon which a rational trier of fact could find, beyond a reasonable doubt, that but for Bowen failing to take action to render aid to Doyle for injuries created by Bowen's conduct, Doyle would not have died. The District Court did not err in denying Bowen's motion to dismiss.

## CONCLUSION

¶35 The District Court did not act arbitrarily in allowing Nelson to testify. Bowen was aware of the nature of Nelson's testimony and of the State's on-going efforts to locate Nelson. When considering the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, the essential elements of negligent homicide. The jury could reasonably have found that Bowen caused the injuries to Doyle. Having caused Doyle's injuries, the jury could also reasonably conclude that Bowen was negligent in failing to render aid to Doyle and that, as a result, Doyle died. We conclude that the District Court did not abuse its discretion when it denied Bowen's motion to dismiss for lack of sufficient evidence.


/S/ LAURIE McKINNON


We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE


16