FILED

11/23/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0024

DA 20-0024

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 301

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

FELIPE AGUSTIN TORRES,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-19-447
Honorable Shane Vannatta, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Michael Marchesini, Assistant Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Tammy K Plubell, Appellate Bureau Chief, Jonathan M. Krauss, Assistant Attorney General, Helena, Montana

          Kirsten Pabst, Missoula County Attorney, Missoula, Montana

Submitted on Briefs:  September 1, 2021

Decided:  November 23, 2021

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Defendant Felipe Torres was charged with two counts of Partner or Family Member Assault (PFMA), both misdemeanors, and one count of Strangulation of Partner or Family Member, a felony, in the Montana Fourth Judicial District Court, Missoula County. Following a five-day jury trial, Torres was found guilty of the second count of PFMA. The jury was unable to reach a verdict on the first PFMA. The District Court dismissed that count without prejudice in its November 13, 2019 judgment. The jury acquitted Torres of the strangulation offense. Torres appeals from his conviction for the second PFMA and seeks remand for a new trial. We affirm.

¶2 We restate the issues on appeal as follows:

*Issue One: Did the District Court err by permitting Torres's ex-girlfriend, Meg, to testify?*

*Issue Two: Was there sufficient evidence to sustain Torres's conviction for the second count of PFMA?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Torres was a member of a Johnny Cash tribute band that received some national acclaim after appearing on the David Letterman Show. In 2017, Torres began dating Bri. The relationship quickly evolved into the couple living together in a shared house with several roommates. Both Torres and Bri engaged in drug use, together and separately. Allegedly, Bri's drug use financially impacted bills and rent payment among the roommates and strained relations between Torres and Bri. Both Torres and Bri testified

2

their relationship began to deteriorate in the fall of 2018 and escalated into physical altercations that continued over the course of 2019.

¶4      On January 27, 2019, the police were called to the Goodwill store where Bri worked. In a 911 call, Bri reported Torres had physically pulled her out of their roommate's car in the store's parking lot.  The encounter ended when the roommate pepper-sprayed Torres in the face.

¶5      Torres was charged with PFMA in Missoula Municipal Court, and an order of protection restricting him from contact with Bri was issued while the case was pending. Pursuant to the order, Torres was subject to GPS monitoring and supervision.  Bri moved out of the shared house and began living with another friend.

¶6      Later that spring, Torres reinitiated contact with Bri via texts.  Their relationship resumed, and Bri began living with Torres again.  However, the relationship became increasingly factious and turbulent over the summer, and physical altercations punctuated the couple's eventual breakup.

¶7      On July 16, 2019, Bri reported to police Torres had been physically violent with her twice in the preceding week.  In the first incident, on or about July 10, an argument escalated into a face-to-face physical encounter which culminated in Torres "headbutting" Bri.  Then on or about July 13, as Bri was packing to leave the house, Torres reportedly restrained her by grabbing her around the throat.

¶8      The State filed an information charging Torres with PFMA-2nd Offense, a misdemeanor, in violation of § 45-5-206, MCA, for the headbutting event on July 10 (Count II), and with Strangulation of Partner or Family Member-1st Offense, a felony, in

3

violation of § 45-5-215, MCA, for the choking event on July 13 (Count III). Later, the State filed a motion to include the Municipal Court PFMA for the Goodwill event (Count I) as PFMA-1st Offense, a misdemeanor, in its charges before the District Court.

¶9    The case was scheduled for trial at the end of October. In the omnibus hearing memorandum filed September 12, 2019, the State was ordered to disclose all witnesses to be called in its case-in-chief, pursuant to § 46-15-322, MCA. The memo also noted the State's intent to introduce evidence of other crimes, wrongs, or acts, or transaction evidence pursuant to M. R. Evid. 404. At that time, Torres's counsel indicated he planned to assert the affirmative defense of justifiable use of force. The memo also noted Torres did not plan to introduce evidence of good character.

¶10    Prior to trial, the State filed a motion in limine to prohibit Torres from discussing Bri's drug use or psychiatric diagnosis on grounds these were impermissible character evidence. Torres argued they went to Bri's credibility. At the pretrial conference, the District Court heard arguments on the State's motion in limine, and Torres withdrew his justifiable use of force defense. The State informed the court that, while it did not intend to go into prior bad acts involving other people in its case-in-chief, it might bring those up in rebuttal "depending on what happens in the defendant's case." Torres's counsel indicated she would submit a prior bad acts jury instruction.

¶11    When trial began, Torres's attorney was permitted to question Bri out of the jury's hearing to lay foundation for inquiry into her drug use and mental health. Following her testimony, the District Court supplemented its Order in Limine, ruling Torres could delve

4

into these topics to the extent they impaired her ability to perceive and accurately remember the events in question.

¶12     The State introduced testimony by roommates who had been partially involved in or overheard aspects of the incidents at issue to corroborate Bri, as well as testimony from the investigating officers, a doctor who had examined Bri's injuries, an expert witness on strangulation, and an expert witness on domestic violence.  On the second day of trial, the State called Bri to testify.  She described her tumultuous relationship with Torres and the events she reported to the police.

¶13     Torres testified in his own defense and gave conflicting testimony about the events in question.  On the Goodwill incident, Count I, Torres admitted only that he grabbed Bri's elbow as he interacted with her at the passenger's side of the car.  He stated he did not go there to cause problems for her.  Yet, text messages the State submitted showed that prior to the confrontation Bri had repeatedly told Torres not to go to her work that day and that she did not feel safe around him.

¶14     While Torres disputed intentionally headbutting Bri during the July 10 incident, Count II, he confirmed that during the fight the couple was in a physical confrontation where he was "bumping her back" and that their heads collided.

¶15     Regarding the strangulation, Count III, both parties agreed Bri was packing to leave and they were discussing their disagreements.  Torres denied arguing with Bri or being angry.  He testified his only physical contact with Bri during the incident was holding her hands to calm her.  Both confirmed a psychotic episode of some sort occurred.  Though Bri admitted that during a prior episode she once mistook Torres for someone else and

5

became irrationally afraid of him, she stated that during the strangulation incident her episode only began after Torres put his hand around her throat. Torres consistently denied touching Bri's neck.

¶16   Immediately after the defense rested its case, the State called Torres's ex-girlfriend, Meg, for rebuttal. Torres objected, and the District Court heard arguments in chambers. The State asserted Torres's testimony had made Meg's rebuttal relevant in three ways: (1) he testified Bri and Meg were responsible for an "online smear campaign" that cast him as a serial abuser and ruined his music career; (2) he testified his relationship with Meg ended when he reported her for embezzlement, indicating she had retaliated with fabricated allegations of strangulation; and (3) he testified, on cross-examination, that he had never cut off anyone's airway. Torres stated he had no prior convictions of domestic violence. He argued the State had not provided notice of Meg as a witness or its intent to use 404(b) prior bad acts evidence and asserted the State had failed to disclose any reports of a prior strangulation.

¶17   The court permitted the State to call Meg but ruled inquiry about obstructing an airway was limited to impeachment. The court ruled that responding to the online campaign and the testimony about Meg's criminal activity were appropriate rebuttal.

¶18   Meg testified Torres had previously strangled her in an uncharged incident that occurred in August 2014 in South Dakota. On cross, Meg confirmed the incident was never reported to the police or prosecuted. Meg confirmed she told Bri about the incident.

¶19   The jury was dismissed for the day immediately following Meg's testimony. Torres requested the court provide a 404(b) prior bad acts instruction and noted it should have

6

been read prior to Meg's testimony but stated the defense was "[thrown] off guard." The court gave the limiting instruction immediately upon recalling the jury the next morning.

¶20 Torres was found not guilty of Count III, the strangulation incident. The jury was unable to reach a unanimous decision on Count I, and the court granted a request to dismiss it in its November 13, 2019 judgment. Torres was convicted solely on Count II, the headbutting incident. He was sentenced to 12 months in the Missoula County Detention Facility with all suspended but 100 days and with credit for time served in the amount of 100 days. He appeals.

## STANDARD OF REVIEW

¶21 Except for related interpretations or applications of law which we review de novo for correctness, we generally review evidentiary rulings, including a district court's ruling to allow witness testimony, for an abuse of discretion. *State v. McGhee*, 2021 MT 193, ¶ 10, 405 Mont. 121, 492 P.3d 518 (citing *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811; *State v. Passmore*, 2010 MT 34, ¶ 51, 355 Mont. 187, 225 P.3d 1229); *State v. Bowen*, 2015 MT 246, ¶ 20, 380 Mont. 433, 356 P.3d 449. An abuse of discretion occurs if a court rules "based on a clearly erroneous finding of fact, an erroneous conclusion or application of law, or otherwise acts arbitrarily, without conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice." *McGhee*, ¶ 10 (citing *State v. Pelletier*, 2020 MT 249, ¶ 12, 401 Mont. 454, 473 P.3d 991; *Derbyshire*, ¶ 19).

**DISCUSSION**

¶22 *Issue One: Did the District Court err by permitting Torres's ex-girlfriend, Meg, to testify?*

¶23 Torres argues the State violated §§ 46-15-322 and -327, MCA, by not disclosing Meg as a witness before trial. At trial, the State acknowledged it had a copy of an order of protection between Meg and Torres, had interviewed Meg, and that it did not provide pretrial notice about calling Meg as a witness. However, the State argues it was only required to disclose witnesses who might be called in its case-in-chief or in rebuttal to the defendant's evidence of good character, affirmative defenses, or lack of statutorily required state of mind.

¶24 Montana requires broad pretrial disclosure by the prosecution. Section 46-15-322, MCA; *State v. Weitzel*, 2000 MT 86, ¶ 30, 299 Mont. 192, 998 P.2d 1154. The purpose of the statute is to provide notice and prevent surprise. *State v. Stewart*, 2000 MT 379, ¶ 22, 303 Mont. 507, 16 P.3d 391. The statute mandates full disclosure of all the material and information within the prosecutor's possession and control, regardless of whether the State believes it is inculpatory or exculpatory. *Weitzel*, ¶ 30; *State v. Licht*, 266 Mont. 123, 129, 879 P.2d 670, 673-74 (1994).

¶25 The State is not statutorily obligated to provide pretrial notice of a witness called to impeach the credibility of a defense witness. *Weitzel*, ¶¶ 31-32 (citing and interpreting *State v. Hildreth*, 267 Mont. 423, 430-31, 884 P.2d 771, 775-76 (1994)). State law limits pretrial disclosure of rebuttal witnesses to those called related to "evidence of good character or the defenses of alibi, compulsion, entrapment, justifiable use of force, or

8

mistaken identity or the defense that the defendant did not have a particular state of mind that is an element of the offense charged." Section 46-15-322(6), MCA; *Riggs v. State*, 2011 MT 239, ¶¶ 34-35, 362 Mont. 140, 264 P.3d 693.

¶26 Here, Torres indicated in the omnibus memo he did not intend to present evidence of good character. He also withdrew his justifiable use of force defense. At the pretrial conference, the State specifically indicated it might introduce evidence of prior conduct on rebuttal but that the decision would depend upon the defendant's testimony.

¶27 On direct, in response to his counsel's question about his employment after the Goodwill incident, Torres testified his job with the band had ended as a result of the Municipal Court PFMA charge and order of protection involving Bri. Torres reported, "[T]here was a major smear campaign online. . . . [T]hey sent letters to our agency and to all the venues we played at saying they would no longer support our band because of the serial abuser that was in the band. . . . [T]he claims were outrageous." Torres also testified the smear campaign "was started from [Bri] reaching out to [his] ex, Megan . . . and it was completely false, completely untrue," as well as that, "It ruined [his] life, it ruined [his] career. . . ."

¶28 Regarding strangulation, Torres repeatedly denied ever choking Bri. On cross, the State opened by asking Torres about comments he made to an investigating officer regarding strangulation. The State then questioned Torres with the following exchange:

> STATE: You understand how serious cutting off someone's air supply is, don't you, Mr. Torres?
>
> TORRES: Yes, I do. (Chuckles.)

9

STATE: You said you never did that to Bri.

TORRES: Never.

STATE: You said you never did that to anyone.

TORRES: I've never done that to anyone.

STATE: You've never done that to anyone, including Bri.

TORRES: Including Bri.

STATE: Or anyone else.

TORRES: Not that I can remember, no. No, I've never strangled anybody.

STATE: Or cut off someone's air supply.

TORRES: Or cut off their air. Not that I can recall.

STATE: Or cut off their circulation.

TORRES: No.

¶29 The State also questioned Torres about the online smear campaign. Torres denied engaging in domestic violence with other women and reaffirmed he believed Bri had started the campaign by reaching out to his ex-girlfriend, Meg.

¶30 On redirect, Torres testified his relationship with Meg had ended when he reported to her work she had been embezzling. He indicated Meg had "made up stories along the way that there had been abuse going on of some sort."[1]

¶31 The State's closing rested heavily upon Torres's lack of credibility and uncontested elements of the couple's encounters, as well as corroboration of Bri's testimony by

---

[1] Meg denied participating in the online smear campaign. On direct, Meg confirmed she pleaded guilty to the embezzlement charges and was currently serving out her sentence.

case-in-chief witnesses. While the State asserted, "The defendant . . . is discredited by his own words; his own text messages, which you will get, and have an opportunity to review; his own history," the State made no explicit mention of Meg's testimony. In closing, counsel for Torres emphasized Torres was "not on trial for any of these allegations from another state five years ago that were never prosecuted." She suggested Bri was "impressionable" and implied Meg had influenced her in making allegations against him. In rebuttal, the State indicated Torres's lack of recollection—his responses, "Not that I can remember," and "Not that I can recall"—about the alleged strangulation of Meg undermined his credibility.

¶32 The State was under no obligation to disclose Meg as a witness prior to trial. Section 46-15-322(6), MCA; *Riggs*, ¶¶ 34-35. Torres did not provide notice of intent to introduce good character evidence or plead an affirmative defense such that notice of a rebuttal witness was triggered under the statute. Further, the State could not have anticipated Torres would choose to testify about the online allegations and Meg's alleged involvement in them or about reporting her criminal activity, which he claimed ended their relationship.

¶33 The District Court did not specifically cite which evidentiary rule it relied upon to admit as rebuttal Meg's testimony about the online smear campaign, her embezzlement, and her supposed retaliation against Torres. However, under M. R. Evid. 607(a) and 404(a)(1), a defendant's testimony may "open the door" to cross-examination or extrinsic evidence related to otherwise inadmissible other acts evidence by making such evidence relevant for the purpose of "explaining or correcting a pertinent false impression or

11

assertion, or rebutting an attack on the credibility of another witness." *McGhee*, ¶ 21 (citing *State v. Polak*, 2018 MT 174, ¶¶ 21-23, 392 Mont. 90, 422 P.3d 112; *State v. Guill*, 2010 MT 69, ¶ 39, 355 Mont. 490, 228 P.3d 1152; *State v. Cesnik*, 2005 MT 257, ¶¶ 15-17, 329 Mont. 63, 122 P.3d 456; *Weitzel*, ¶ 35; *State v. Veis*, 1998 MT 162, ¶ 18, 289 Mont. 450, 962 P.2d 1153).

¶34 Torres's trial strategy rested heavily upon the theories that (1) Bri was an unreliable witness, and her accounts substantially mischaracterized the events in question, and (2) Bri was suggestible and had been influenced in her characterizations of events by others. For instance, on cross of Bri, Torres asked the following: "[Y]ou told the detective . . . that you didn't even think of strangulation until Kim, the victim advocate who works with the prosecutor's office, brought it up. Is that accurate?" Torres repeatedly and consistently sought to undermine Bri's testimony by delving into her mental health issues and drug use, alleging she told others she had "played the victim," indicating others had told her she needed to "get dirt" on him before he called the police on her, and testifying that Bri and Meg were instigators of the online allegations against him. Torres sought to paint himself as a victim who had been maligned by false accusations. He asserted Meg had influenced Bri to fabricate allegations. Torres testified the online accusations of serial abuse were "outrageous," "completely false," and "completely untrue."

¶35 The State was entitled to refute Torres's testimony that Bri's accusations were part of a fabricated vendetta by Bri and Meg. The District Court correctly ruled Meg's testimony about the online smear campaign and her prior embezzlement and alleged retaliation were appropriate rebuttal.

12

¶36 However, the District Court also ruled Meg could testify about "obstructing of airway" for the purposes of impeachment. Torres disputes the characterization of Meg as an impeachment witness. Torres argues Meg's testimony about a prior strangulation was strategically planned as an ambush by the State. Torres argues Meg was called to provide case-in-chief evidence and was only "masquerading" as a rebuttal witness, and as such was subject to the pretrial disclosure requirements of § 46-15-322(6), MCA.

¶37 Torres's primary dispute is the inappropriate scope of the State's cross about any prior strangulations. Torres objects that, "[R]ebuttal testimony is proper only if it tends to counteract a new matter offered by the adverse party." *State v. Redlich*, 2014 MT 55, ¶ 34, 374 Mont. 135, 321 P.3d 82. Distinguishing the instant case from *State v. Madera*, 206 Mont. 140, 670 P.2d 552 (1983), Torres contends it was the State's cross-examination that created "the trap" that opened the door to Meg's rebuttal testimony, not Torres's defense strategy. Torres notes Meg was already available in the courtroom and immediately ready to testify at the close of Torres's case. Torres contends the ability to reasonably anticipate the need for rebuttal testimony is an exception to *Weitzel* that applies here.

¶38 Under M. R. Evid. 402, "all relevant evidence is admissible," except as otherwise provided by related rules or law. *McGhee*, ¶ 17. Relevant evidence includes that bearing upon a witness's credibility. M. R. Evid. 401; *McGhee*, ¶ 17. Cross-examination is the primary means of impeaching a witness's credibility. *State v. Smith*, 2020 MT 304, ¶ 29, 402 Mont. 206, 476 P.3d 1178. Under M. R. Evid. 611(b)(1), the scope of

cross-examination "should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness."

¶39 M. R. Evid. 404(b) generally precludes (with specific exceptions) the admission of a defendant's prior bad acts because "'prior acts or crimes are highly prejudicial to the defendant, and usually irrelevant for the purposes of the charged crime.'" *State v. Rogers*, 2013 MT 221, ¶ 31, 371 Mont. 239, 306 P.3d 348 (quoting *Derbyshire*, ¶ 51). This rule is to be strictly enforced to ensure a defendant is not convicted "'merely because he is an unsavory person' or on the rationale that because he committed a crime in the past, he has a defect of character that makes him more likely . . . to have committed the charged offense." *Derbyshire*, ¶ 22 (quoting *State v. Gowan*, 2000 MT 277, ¶ 19, 302 Mont. 127, 13 P.3d 376).

¶40 Additionally, prior uncharged conduct is generally irrelevant impeachment evidence because of its "limited probative value in relation to credibility." *Smith*, ¶ 29 (citing *State v. Short*, 217 Mont. 62, 67, 702 P.2d 979, 982 (1985)). The risk of prior bad acts evidence is that it is "highly prejudicial by nature due to the great risk that it will emotionally provoke the jury to desire to punish the defendant for prior bad conduct or, at least, give the prior bad acts evidence undue weight over the actual case-specific evidence of guilt or innocence centrally at issue." *Pelletier*, ¶ 26.

¶41 Here, the State engaged in a sharp practice. While Torres provided direct testimony denying he had ever strangled Bri, the first time he categorically denied strangling anyone else was in response to the State's explicit questioning on cross. The prosecutor's line of questioning Torres's prior acts on cross-examination was error. Torres did not open the

14

door that would provide something to rebut or impeach. Rather, the prosecutor's own questions "set the trap."

¶42 The District Court was obligated to balance the probative value of Meg's testimony regarding Torres's prior strangulation against the risk it might result in unfair prejudice. M. R. Evid. 403; *State v. Madplume*, 2017 MT 40, ¶ 32, 386 Mont. 368, 390 P.3d 142. Yet, evidence of prior bad acts rises to unfair prejudice "only 'if it arouses the jury's hostility or sympathy for one side without regard to its probative value, if it confuses or misleads the trier of fact, or if it unduly distracts from the main issues.'" *Madplume*, ¶ 33 (quoting *State v. Hicks*, 2013 MT 50, ¶ 24, 369 Mont. 165, 296 P.3d 1149).

¶43 On appeal, Torres also renews his argument that the late revelation of Meg as a witness violated his substantive constitutional trial rights under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375 (1985), and *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555 (1995), by depriving him of the ability to prepare a meaningful cross-examination. Additionally, Torres indicates anticipation of Meg's testimony might have influenced his decision to testify altogether.

¶44 Reversal on either of Torres's claims of (1) improper admission of prejudicial prior bad acts, or (2) unfair surprise rebuttal and lack of due process, rests on whether the jury's conviction was soundly achieved. "[A] defendant's right to due process 'is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense' and the defendant must demonstrate that the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine

15

confidence in the verdict.'" *State v. Root*, 2015 MT 310, ¶ 19, 381 Mont. 314, 359 P.3d 1088 (quoting *Kyles*, 514 U.S. at 435-37, 115 S. Ct. at 1566-67).

¶45 Section 46-20-701(1), MCA, specifically addresses the appellate standard of review regarding a convicted person's substantial rights: "A cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial." "If evidence has been improperly admitted . . . we will find reversible error based on prejudice to the defendant where there is a reasonable probability that the inadmissible evidence might have contributed to the conviction." *Gowan*, ¶ 9. *See also State v. Van Kirk*, 2001 MT 184, ¶¶ 29, 47, 306 Mont. 215, 32 P.3d 735 (citing § 46-20-701(1), MCA).

¶46 In *State v. Colburn*, 2018 MT 141, ¶¶ 13, 15, 18, 391 Mont. 449, 419 P.3d 1196, the defendant was acquitted of incest charges, despite the admission of prejudicial and potentially inflammatory 404(b) evidence indicating prior suggestive Internet searches. We held the 404(b) evidence, "[c]learly . . . did not distract or incite the jury's hostility toward [the defendant]." *Colburn*, ¶ 18.

¶47 The jury's verdict indicates Meg's testimony did not arouse the jury's hostility toward Torres such that there is a reasonable possibility he was convicted on anything other than the permissible evidence. Though admission of Meg's testimony on the prior strangulation was error, the jury saw through the State's tactics, and the error was harmless.

¶48    *Issue Two: Was there sufficient evidence to sustain Torres's conviction for the second count of PFMA?*

¶49    "We review questions on the sufficiency of the evidence in a criminal case to determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Polak*, ¶ 34.

¶50    As to Count II, "[a] person commits the offense of partner or family member assault if the person . . . purposely or knowingly causes bodily injury to a partner or family member." Section 45-5-206(1)(a), MCA.

¶51    Torres claims the jury was prejudiced by Meg's testimony and was prompted to find him guilty of something because "[he] was a dangerous person deserving of punishment" rather than based on the evidence presented at trial. Torres also asserts the court's 404(b) limiting instructions were inadequate to overcome the prejudicial effect of Meg's testimony about a prior uncharged strangulation. He argues admission of her impermissible character evidence influenced his conviction on the headbutting PFMA.

¶52    The State contends there was undisputedly sufficient evidence for conviction on Count II. The State also argues that the jury must be presumed to have followed the court's limiting instruction. *See Pelletier*, ¶ 46 (Rice, J., dissenting) (citing *State v. Michelotti*, 2018 MT 158, ¶ 23, 392 Mont. 33, 420 P.3d 1020).

¶53    On the headbutting charge, in addition to corroborating witness testimony, the State submitted photographic evidence showing Bri's injuries. State's Exhibits 9 and 10 clearly show Bri with bruising and a laceration on her nose and blackened eyes after the incident.

State's Exhibit 11 shows Torres with only a minor scratch on his forehead. Both Torres and Bri confirmed the headbutting in their testimony. However, Torres denied having the requisite intent, stating the contact was accidental and indicating Bri was the instigator. Torres also submitted photographic evidence showing stains on his shirt from Bri throwing a slushy at him just prior to the incident.

¶54　In Torres's testimony, he confirmed that during the week of the charged incidents they were arguing in his car, and Bri exited the vehicle in the middle of traffic. He denied physically restraining her. However, the State's evidence included a text where Torres admitted his culpability. The text from Torres to Bri stated, "you never deserved that kind of treatment yesterday or the others before," in response to Bri's text indicating he had held her "hostage in a car while keeping [her] in a headlock." In response to his counsel's question about his text admission, Torres stated he was trying to calm Bri down because "when she said that I held her hostage in the car," he thought, "here we go again with this kind of pointing a finger again of something that didn't really occur."

¶55　To the extent that the jury weighed Torres's credibility against the other witness' testimony, "'The weight of the evidence and the credibility of the witnesses are exclusively within the province of the trier of fact. . . .'" *Polak*, ¶ 28 (quoting *State v. Bower*, 254 Mont. 1, 8, 833 P.2d 1106, 1111 (1992)). "[T]his Court on review will not substitute its judgment for that of the jury." *State v. Merseal*, 167 Mont. 412, 415, 538 P.2d 1366, 1367 (1975). *See also State v. Jackson*, 2009 MT 427, ¶ 23, 354 Mont. 63, 221 P.3d 1213. Further, "[C]onflicting testimony does not render the evidence insufficient to support a conviction." *Bowen*, ¶ 30. "The testimony from any one witness, that the jury believes, is sufficient to

prove any fact in a case." *Bowen*, ¶ 30. There was also ample tangible evidence in the record corroborating Bri's version of the headbutting and the resulting extent of her injuries.

¶56   Taken together, the testimony of Bri and Torres describe a nearly identical relationship, filled with conflict and turmoil fueled by drug abuse, often ending in violence. Torres acknowledged the struggle and chaos, admitted he headbutted Bri, but argued she initiated the violence and that it was "accidental."

¶57   Clearly there was sufficient evidence to support Torres's conviction of PFMA as charged in Count II.

## CONCLUSION

¶58   The conviction of Torres is affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE